**ACKERLEY COMMUNICATIONS OF MASSACHUSETTS, INC.,**
Plaintiff, Appellant,

v.

**CITY OF SOMERVILLE,**
Defendant, Appellee.

No. 88–1802.

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1989.

June 12, 1989.

As Amended July 19 and July 21, 1989.

Andrew L. Frey, with whom Kenneth S. Geller, Andrew J. Pincus, Jerome M. Marcus, Mayer, Brown & Platt, Washington, D.C., George A. Berman, Posternak, Blankstein & Lund, Boston, Mass., Eric Rubin and Rubin, Winston & Diercks, Washington, D.C., were on brief for plaintiff, appellant.

Peter L. Koff, with whom Weston, Patrick, Willard & Redding, Boston, Mass., and Anthony P. Sullivan, City Sol., were on brief for defendant, appellee.

Before SELYA, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

This case requires us to decide whether a city ordinance regulating billboards and other signs violates the First Amendment. The central issue is the validity of distinctions drawn between "onsite" and "offsite" signs and between commercial and noncommercial messages.[1] The district court, in a thoughtful and comprehensive opinion, found that the ordinance withstood constitutional scrutiny. *Ackerley Communications of Massachusetts, Inc. v. Somerville,* 692 F.Supp. 1 (D.Mass.1988). We conclude that the particular means chosen to reduce the number of billboards is constitutionally impermissible.

I.

Officials in Somerville, Massachusetts first passed a sign ordinance in 1977, after nearly a decade of advice from planning experts, who viewed reduction of the number of signs in the city as a necessary step

1. An onsite sign carries a message that bears some relationship to the activities conducted on

toward Somerville's economic and aesthetic revitalization. The 1977 regulation, which was the first version of Article 10 of the Somerville Zoning Ordinance, was declared facially unconstitutional in 1985 by a Massachusetts Superior Court judge.[2]

Somerville immediately proceeded to revise Article 10, and Mayor Eugene Brune submitted a new version of the ordinance to the Board of Aldermen in September 1985. The preamble to the regulation stated that its purposes were:

> to preserve and enhance the substantial interests of the City of Somerville in the appearance of the City; to preserve and enhance the public interest in aesthetics; to preserve and increase the amenities of the municipality; [and] to control and reduce visual clutter and blight....

Article 10, Section 10.1.2. The proposed ordinance contained a number of specific size, height and location restrictions applicable to all signs in Somerville. Of particular significance here is that it also contained a "grandfather" provision—section 10.7—that exempted all existing nonconforming signs from the regulation's requirements unless they were used for offsite commercial advertising. Thus, signs that failed to meet the requirements of Article 10 could nevertheless remain in use

provided they did not carry messages advertising businesses, goods, or products available in places other than at the sign's location. In other words, all signs that carried noncommercial messages, whether onsite or offsite, and signs that displayed *onsite* commercial messages could continue in use, regardless of their size and location.

After this proposal was submitted to the Board of Aldermen, Ackerley Communications, Inc., a billboard company and the appellant here, sought to work out a compromise with city officials that would allow it to keep some of its offsite commercial billboards, which produced nearly all of its income in Somerville. The negotiations between Ackerley and Somerville reached an impasse in April 1986, and Mayor Brune resolved at that time to resubmit the ordinance to the Board of Aldermen for final action.

Mayor Brune, however, did not resubmit the September 1985 version of the ordinance. At the last meeting between Ackerley and the city, Ackerley's representative indicated that the company would comply with the ordinance not by removing its billboards but by using them exclusively for either noncommercial messages or to advertise products offered for sale on the premises (i.e., for onsite commercial messages)—both exempted uses under section

the premises where the sign is located. For example, an onsite sign may simply identify a business or agency ("Joe's Hardware" or "YMCA"), or it may advertise a product or service available at that location ("Budweiser Beer" at Parise's Cafe or child care at the Lutheran church). Depending upon the business or agency, the message on the sign may be deemed either commercial or noncommercial. An offsite sign—the category into which most billboards fit—carries a message unrelated to its particular location. These signs also may display either commercial or noncommercial messages. For example, an offsite sign may advertise "Great Gifts at Kappy's Liquors," with Kappy's Liquors being located at some distance from the sign, or it may say "No one should be left out in the cold. Write: Citizens Energy Corp."

Thus, the onsite/offsite distinction is not a distinction between signs attached to buildings and free standing signs. An offsite sign may be located on a building rooftop, but because the product, good, or service it advertises is not available at the sign's location, it is classified as offsite. For example, if a sign advertising the products available at Joe's Hardware is located atop the Parise Cafe building, Joe's sign is offsite.

2. Judge Young, now a United States District Court judge, ruled that the statute impermissibly allowed Somerville to choose arbitrarily among signs on the basis of content. For a more detailed description of the 1977 ordinance and Judge Young's conclusions, see the district court's opinion in the present case, 692 F.Supp. at 6.

10.7's grandfather clause. In response to this announced intention, Mayor Brune decided to revise Article 10 again to ensure that, at the most, only a few Ackerley billboards could remain. 692 F.Supp. at 7.

The new revision made by the mayor and his legal advisers involved only one significant change: the exemptions in section 10.7 would now apply only to signs that had not displayed offsite commercial advertising since July 28, 1985—a year before the expected effective date of the ordinance. Thus, the owner of a nonconforming sign would not be able to save a sign—as Ackerley had planned—by changing it from an offsite commercial use to either an onsite commercial use or a noncommercial use.

With regard to nonconforming signs, then, the revision provided for the following exemptions: (1) signs carrying onsite messages on the date of enactment, and which had carried those messages for at least a year, are grandfathered, whether commercial or noncommercial, and (2) signs carrying offsite messages on the date of enactment are grandfathered only if their messages are noncommercial, and had been so for a full year.[3] Owners of signs displaying onsite messages have the additional option of replacing their onsite messages with offsite noncommercial ones.

This last version of Article 10 was approved by the Somerville Planning Board and enacted by the Board of Aldermen on July 24, 1986. It went into effect four days later. This is the version of Article 10 at issue here.[4]

To briefly set the scene, we offer the following description of signs and billboards in Somerville, which is drawn largely from the district court's findings of fact:

1. At the time of trial, there were 83 signs or billboards in Somerville that regularly carried offsite messages. Of these, 81 were owned and maintained by Ackerley, and the other two were maintained by a company owned by Ackerley.

2. None of Ackerley's signs conforms to the location, size or height requirements of Article 10. In addition, nearly all of Ackerley's billboards were used at some point after July 28, 1985—the operative date of the grandfather provision—to display offsite commercial advertising.[5] Thus, at best a handful of Ackerley's billboards would be grandfathered under the May 1986 version of Article 10, and full enforcement of the ordinance would mean that Ackerley has to remove them at great expense.

3. An extensive survey of nonconforming signs in Somerville conducted in December 1987–January 1988, which the offsite signs in Somerville meet the one-year requirement.

---

**3.** We note that the ordinance actually applies the same prerequisite for exemption to all signs, whether they display an onsite or offsite message on the date of enactment, although the impact on each category is significantly different. The question in both instances is whether the sign has carried an offsite commercial message at any time during the previous year. Given the realities of commercial practice, this means that virtually all signs carrying an onsite message on the date of enactment would be exempted because they continuously would have carried an onsite message, usually identifying or advertising the business or other activity located at the same spot as the sign. It also means that virtually all signs with offsite messages at the time of enactment would *not* be exempted because those signs change messages regularly, and almost certainly would have carried an offsite commercial message at some time during the previous year. *See* 692 F.Supp. at 5. Indeed, it appears from the record that no

**4.** Section 10.7 states, in relevant part:
Section 10.7.1. This Article shall apply to any nonconforming sign which at any time during the year preceding the effective date of this Article, or at any time thereafter, advertises or promotes the sale of goods, products, or services not sold, provided, or manufactured upon the same premises on which the sign is located.
Section 10.7.2. Except as provided in Section 10.7.1, this Article shall not apply to any nonconforming sign legally erected prior to the effective date of this Article.

**5.** The only possible exceptions are four to seven billboards that Ackerley claims should be classified as *onsite* commercial signs. 692 F.Supp. at 5.

parties agree is representative although not complete, identified at least 200 nonconforming *onsite* signs, nearly all of which are commercial, and all of which would be grandfathered under section 10.7.[6]

The district court found that the effect of Article 10 will be "to eliminate virtually all noncommercial messages conveyed by nonconforming signs in Somerville while leaving undisturbed nonconforming signs delivering on-premise commercial advertising. The only arguably noncommercial nonconforming signs which will remain after enforcement of revised Article 10 will be those which identify essentially eleemosynary institutions." 692 F.Supp. at 10.

Ackerley challenged the ordinance on several constitutional grounds. *See Ackerley Communications*, 692 F.Supp. at 3. We address here only Ackerley's claim that the ordinance violates the First Amendment.

## II.

The first step in evaluating whether a government regulation of speech violates the First Amendment usually is to determine whether the regulation at issue is "content-based" or "content-neutral." If the government seeks to regulate speech based on its content, it must meet "a much more exacting standard" than if the regulation is facially neutral and restricts only the "time, place, or manner" of speech. *Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir.1985). *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986); *Carey v. Brown*, 447 U.S. 455, 462–63 & n. 7, 100 S.Ct. 2286, 2291–92 & n. 7, 65 L.Ed.2d 263 (1980); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209–12, 95 S.Ct. 2268, 2272–74, 45 L.Ed.2d 125 (1975).

Somerville asserts that Article 10 is a classic, permissible time, place, or manner restriction. Moreover, the city emphasizes that the ordinance was carefully drafted to avoid the constitutional infirmities afflicting the billboard ordinance reviewed by the Supreme Court in *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion). Ackerley's primary claim is that the ordinance is content-based and, despite its facial preference for noncommercial speech, that it impermissibly favors commercial advertising over noncommercial messages.

Although we agree with Somerville that the challenged portions of its ordinance do not suffer from the specific problems fatal to San Diego's regulation, we conclude that the ordinance is inconsistent with the First Amendment. In reaching this result, we have found the content-neutral/content-based dichotomy to be unhelpful, and therefore have not attempted to analyze Article 10 within that framework.

The constitutional defect in Article 10 is in its grandfather provision, which exempts certain nonconforming billboards from complying with its size, height and location restrictions. To understand the problem it is necessary to consider carefully what the Supreme Court decided in the *Metromedia* case, the Court's first full review of a city's attempt to regulate billboards.

San Diego's ordinance had exempted from a general ban on billboards all onsite commercial advertisements. In finding the ordinance unconstitutional, the Court reached three significant conclusions.[7] First, it held that San Diego was free to place greater value on onsite commercial advertising than on the interests underlying the general ban on billboards, which were traffic safety and aesthetics. *Id.* at 512, 101 S.Ct. at 2895 ("The city has decided that in a limited instance—onsite com-

---

**6.** Four of these approximately 200 signs identify apparently noncommercial institutions: (1) a YMCA; (2) Somerville Boys & Girls Home; (3) Somerville Hospital; (4) The Somerville Home. There are at least three other nonconforming onsite signs that would be grandfathered and are not overtly commercial, but which were not included in the survey: (1) Jeane Juggan Residence and Pavilion, Little Sisters of the Poor; (2) Visiting Nurse Foundation, Mystic–Charles ContinuCare; (3) St. Catherine of Genoa.

**7.** Each of these had support from at least five justices, although not from the same configuration.

mercial advertising—its interests should yield. We do not reject that judgment."). *See also id.* at 541, 564–65, 569–70, 101 S.Ct. at 2909, 2921–22, 2924. Thus, San Diego could constitutionally exempt some signs from the general ban.

Second, the Court held that the city could exempt onsite commercial signs without also exempting offsite commercial signs. 453 U.S. at 512, 101 S.Ct. at 2895 ("[T]he city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising *commercial enterprises located elsewhere.*") (emphasis added). *See also id.* at 541, 564–65, 569–70, 101 S.Ct. at 2909, 2921–22, 2924. A majority saw no First Amendment problem in distinguishing between onsite and offsite commercial speech.

Third, a majority of the Court held that San Diego could not, however, prohibit the display of *noncommercial* messages in places where commercial billboards were permitted.[8] Once the city had decided that its interest in onsite commercial advertising outweighed its interests in aesthetics and traffic safety, and therefore that certain billboards should remain despite their aesthetic consequences, it could not then restrict the content of those billboards to commercial messages. The plurality stated:

> Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.

453 U.S. at 513, 101 S.Ct. at 2895 (footnote omitted).

In other words, if the owner of Joe's Hardware wants to replace his "Joe's Hardware" sign with a sign saying "No Nukes," he must be allowed to do so. This result follows logically from the First Amendment's value structure; if a commercial message overrides the city's aesthetics and safety interests, any message that is at least as important in the First Amendment hierarchy also must override those interests. Because noncommercial speech is entitled to a higher degree of protection than commercial speech, San Diego could not decide that its aesthetic and safety interests were outweighed by the need to express commercial messages but not by the need to express noncommercial messages. *See also John Donnelly & Sons v. Campbell,* 639 F.2d 6, 16 (1st Cir. 1980) (invalidating a sign ordinance whose "impositions are both legally and practically the most burdensome on ideological speech, where they should be the least").

*Metromedia,* then, addressed what content must be allowed on a particular billboard that is exempted from a sign ordinance. In effect, *Metromedia* set up a hierarchy of values for those signs: an offsite commercial message may be deemed less important than the interest underlying the ordinance (aesthetics or safety) which, in turn, may be deemed less important than an onsite commercial message. And if an onsite commercial message trumps the government's interest, then so too must a noncommercial message.

Thus, a sign regulation following *Metromedia* if it exempts existing billboards, must allow these signs in the future to carry noncommercial messages as well as onsite commercial messages, and it may require removal of a sign that does not display one of these two types of messages. The version of Article 10 drafted in September 1985 did exactly this. The version before us does not. Once Ackerley expressed its willingness to change all of

---

**8.** This was the specific holding of the plurality of four justices. Although Justice Brennan found the ordinance unconstitutional for other reasons, and never explicitly adopted this conclusion by the plurality, we understand his views to incorporate at least this narrow holding. *See* 453 U.S. at 536, 101 S.Ct. at 2907 (agreeing with the plurality that the Court's cases have accorded more protection to noncommercial than to commercial speech).

its offsite commercial messages to either noncommercial or onsite commercial ones, Somerville changed the ordinance so that it no longer fell within the *Metromedia* guidelines.

Instead of allowing all nonconforming signs to be eligible for exemption by carrying *in the future* noncommercial or onsite commercial messages, Somerville restricted the exemption in section 10.7 to those signs that had carried no offsite commercial speech during the entire year *preceding* Article 10's enactment. *See supra* at note 4.[9] This means that even a sign that carried a noncommercial message on the day Article 10 went into effect, and which had carried noncommercial messages for all but one day of the preceding year, would not be permitted in the future to display noncommercial or onsite commercial messages.

Somerville freely acknowledges that the change was intended to reduce the number of nonconforming noncommercial and onsite commercial signs that would be allowed to remain in Somerville. This intent is not inconsistent with the hierarchy of messages developed by the Court in *Metromedia*. While a city might well consider a limited number of noncommercial and onsite commercial messages to be more valuable than its interest in aesthetics, it might also conclude that aesthetics prevail over these messages in bulk. The city therefore would need some method of limiting the exemption so that the noncommercial and onsite commercial signs would not be so numerous that the benefit of the messages they carried would be outweighed by their aesthetic harm.

Section 10.7 is Somerville's attempt to make the cut, and whether the technique employed is constitutionally permissible is the question before us.[10] Specifically, we must address whether Somerville may choose the signs that will be permitted in the future to carry noncommercial and onsite commercial messages by looking at whether those signs carried such messages exclusively for the previous year. Phrased another way, the issue is whether a severe penalty—a prohibition against future speech—may be imposed on a speaker because he in the past engaged in a certain kind of lawful but less favored speech. We conclude that the First Amendment does not permit this particular discrimination.

What Somerville's ordinance does on its face is to bar some, but not all, speakers from displaying messages in a particular manner, i.e. with nonconforming billboards.[11] Somerville has totally prohibited Ackerley and anyone else who displayed offsite commercial messages on their nonconforming signs in the past year from using those signs, while others are allowed to use similarly nonconforming signs. This is so regardless of Ackerley's willingness in the future to display only the types of messages Somerville prefers. Thus, Somerville has not limited completely a manner of speaking—nonconforming signs—but instead permits only certain speakers to speak in such a manner. Even if a complete ban on nonconforming signs would be permissible, we must consider carefully the government's decision to pick and choose among the speakers permitted to use such signs. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 784–85, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978) ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and *the speakers who may address a public issue*.") (emphasis added); G. Stone, "Content Regulation and the First Amendment," 25 William and Mary L.Rev. 189, 244–251 (1983) (discussing speaker-

---

**9.** A regulation that links a sign's eligibility for exemption to the nature of the messages it carried is obviously content-based, although not necessarily impermissible.

**10.** The Supreme Court in *Metromedia* did not need to examine how San Diego chose which signs to exempt from its ordinance because, as noted earlier, the San Diego regulation suffered

from the more glaring defect that the billboards exempted were not allowed to display noncommercial messages.

**11.** In referring to a "speaker," we are referring to the person who is able to choose the message on a particular sign.

based restrictions).[12]

In this case, however, we have a more serious problem than usually arises when a government distinguishes among speakers. Somerville has chosen who may use nonconforming billboards by looking to past speech. It is without question that the government may not impose a penalty—in this case, denying the right to continue speaking by means of nonconforming signs —because of a person's constitutionally protected past speech. *See Speiser v. Randall*, 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958) (reviewing statute imposing loyalty oath as a condition for receipt of veterans tax exemption) ("To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech."). *See also Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 545, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("the government may not deny a benefit to a person because he exercises a constitutional right") (citing *Speiser*); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (same); *Commonwealth of Massachusetts v. Secretary of Health and Human Services*, 873 F.2d 1528, 1543 (1st Cir.1989) (quoting *Perry*). *Cf. Grayned v. City of Rockford*, 408 U.S. 104, 120, 92 S.Ct. 2294, 2305, 33 L.Ed. 2d 222 (1972) ("the ordinance gives no license to punish anyone because of what he is saying").

The impropriety of distinguishing between speakers in this manner is evidenced by the significant chilling effect that we envision if we validate the ordinance. The penalty here is so great—the loss of First Amendment rights—that speakers in a variety of circumstances may hesitate to speak freely, particularly on matters and in ways not historically viewed as within the mainstream, for fear that their past speech later will be declared less important, and thus trigger such a penalty.

If public authorities conclude that they may achieve the permissible goal of limiting participation in certain activities by recourse to past speech, the following results are within the realm of possibility. In setting eligibility requirements for the admission of artists to a municipal exhibit of, say, political or historical works, authorities might specify the exclusion of artists who in the past had produced sexually explicit works. Such artists, therefore, may feel pressure to sanitize their labors out of a concern that they may be excluded from future exhibits.

Similarly, public authorities endeavoring to regulate a large open-air concert might decide to limit participation to musical groups whose past performances had not contained arguably offensive words. In anticipation of such a decision, performers may feel compelled to restrain their typically bawdy performances, which enjoy full First Amendment protection, simply to protect their chances to appear at a future public event, not involving such content. Or, a municipality may seek to control parade permits by excluding only those who in the past had never distributed leaflets while picketing or parading. Although these sorts of restrictions may be hard to imagine, this scenario flows logically from a decision upholding the Somerville ordinance. *See NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) ("The threat of sanctions may deter [the] exercise [of First Amendment rights]

---

12. We need not decide whether this case is more properly analyzed under the Equal Protection Clause as involving a legislative classification implicating a fundamental right, or solely under the First Amendment. Either analysis would lead to the same result. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972) (noting the close connection between First Amendment interests and an equal protection claim where ordinance treats some types of picketing differently from others); L. Tribe, *American Constitutional Law* 1459 (2d ed. 1988) (noting that either equal protection, due process or First Amendment analysis would have sufficed in *Mosley*). *See also Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (analyzing statute under both First Amendment and equal protection approaches); *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (same).

almost as potently as the actual application of sanctions.").

Thus, if Somerville is allowed to base the future right to engage in noncommercial or onsite commercial speech on whether the potential speaker has in the past engaged in offsite commercial speech, we fear that other kinds of lawful, protected speech—particularly at the lower end of the First Amendment hierarchy—are likely to be chilled.[13] Indeed, other billboard companies whose cities presently do not disfavor offsite commercial speech nevertheless might refrain from those messages for fear that their cities one day may enact an ordinance like Article 10. And in addition to its impact on such less favored categories as commercial speech or "dirty words," the chill could just as easily affect more highly valued forms of speech. An artist who wants to secure her future right to exhibit political works may forego her present desire to engage in purely aesthetic art in the belief that a government in the future might apportion the right to exhibit political works by looking at whether an artist had exhibited only that kind of work in the past.

Section 10.7's reliance on past speech as a mechanism for allocating the future right to speak substantially distances this ordinance from the typical time, place, manner regulation or zoning ordinance. Although a time, place, manner regulation restricts certain future speech, any individual is allowed to comply *prospectively* with the regulation. For example, a regulation allowing parades only during the daytime imposes a limitation on speech, but anyone willing to comply with the daytime requirement is permitted to speak. Furthermore, time, place, and manner restrictions are never, by definition, content-based; they do not, therefore, attempt to control the content even of less-favored speech.

In this case, Somerville restricts signs that do not conform to its newly enacted size, height and location requirements. Such signs may be displayed only if they carry onsite commercial or noncommercial messages. But unlike the typical time, place, manner restriction, not everyone is permitted to comply prospectively with this limitation. Instead, certain individuals are not allowed to comply because of their past *lawful* speech. From a First Amendment perspective, a speaker-based restriction linked to the content of past speech is extreme; a certain kind of past speech, though lawful and protected, is "punished" by a bar against future speech. It is as if, in the example used above, future daytime parades were restricted to those who had not marched at night in the past.

Similarly, the usual zoning regulation restricts future uses of property, while exempting some once-permitted-but-now-banned uses. The City of Somerville might, for example, allow in the future only junkyards that are less than one square block in size, while grandfathering larger junkyards only if, in the past year, they had never stockpiled tires. As in any zoning case, the junkyard owner could bring an equal protection claim, challenging the rational basis for the tire distinction. In this case, the distinguishing criterion is the content of past *lawful* speech. Thus, because the government is imposing a penalty—no exemption from the ordinance—based on the past content of speech, the regulation raises serious First Amendment concerns that require more than rational basis scrutiny.

Given the penalty nature of section 10.7, with its attendant chilling effect, Somerville has a substantial, perhaps impossible, burden to overcome in justifying the regulation. *Compare Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) (discriminations among picketers must be tailored to serve a substantial governmental interest) *with Perry*, 408 U.S. at 597, 92 S.Ct. at 2697 (no explicit weighing of interests where government penalized an individual based on constitutionally protected speech). We

---

**13.** We do not mean to suggest that a chill on lawful speech is never permissible. In the areas of obscenity and defamation, we obviously risk some chill of lawful speech because of the substantial interests at stake. As we discuss below, we find no interest sufficient to overcome the chill that would result from our validation of Article 10.

have no doubt that aesthetics, the interest underlying Article 10 as a whole, are a matter of substantial importance to Somerville. Although we think it highly unlikely that aesthetics ever could be a sufficient justification for a penalty on speech, we need not consider that issue because the distinction based on past speech in section 10.7 clearly has no relationship to aesthetics and, indeed, Somerville does not suggest that it does.[14]

The district court concluded that Somerville could choose to exempt sign structures that had been used for favored speech "with some measure of consistency" because "it is not unreasonable for the City to reserve special protections only for those structures which had been used in a fashion which indicated a non-transitory commitment to noncommercial [or onsite commercial] messages." 692 F.Supp. at 23.

Yet when a city's goal is to reward one type of speech, the necessary effect is that all other types of speech are penalized. A finding that the motive was to promote, rather than to penalize, a certain type of speech does not alter this fact. We need not decide, however, whether the decision to promote one type of speech to the detriment of another ever could survive First Amendment scrutiny because, in this case, the ordinance does not even further the city's interest in promoting noncommercial or onsite commercial messages. The record here shows no connection between a particular sign's message during a given period of time and the sign owner's level of commitment to preferred messages. The district court found that before the 1986 version of Article 10 was enacted, Ackerley devoted about 15 percent of its advertising space at any given time to noncommercial organizations. 692 F.Supp. at 5. The nature of the outdoor advertising business is such, however, that signs change several times a year. Thus, while Ackerley consistently dedicated a significant portion of its advertising space to noncommercial messages, no single sign consistently carried such messages. As a result, because Article 10 requires that each particular sign structure must have had an unbroken commitment to the preferred messages, at most only a handful of Ackerley's 81 signs—those that carried only onsite commercial advertising—would survive under section 10.7.

Ironically, by varying the signs carrying commercial and noncommercial messages, Ackerley probably reached a wider cross-section of people with its public interest messages than it would have had it chosen instead to designate 15 percent of its signs as the invariably noncommercial ones. Signs in different locations presumably have somewhat different audiences, and so the greater the number of signs used for noncommercial messages, the wider the exposure. Thus, section 10.7 is not an effective means of singling out those speakers with a commitment to highly valued messages.

We find it hard to imagine any circumstances that could be present in this case that would make it legitimate for the government to prohibit sign owners from "speaking" in the future based on the content of their past speech. This is particularly so because there was no warning that a link between past and future speech ever would be made, virtually creating a trap door through which Ackerley unwittingly fell. It is not enough that one familiar with the Supreme Court's jurisprudence would have known that commercial speech is considered comparatively less important. We think it all but obvious that Ackerley deserved notice that a consequence of the decision to speak on less important, though *constitutionally protected* subjects, would be the loss of its right ever to display on its

---

**14.** It must be remembered that there is no basis for assuming that the onsite commercial signs exempted by section 10.7 would be less aesthetically offensive than signs not qualifying for exemption. Under the regulation, if two buildings standing side-by-side each had rooftop signs measuring 200-square-feet, one sign could be permitted to remain because it advertised a product sold onsite while the other could be banned because it carried an offsite commercial advertisement at some point during the prior year. Thus, there is no aesthetic justification for the distinction.

nonconforming signs the most highly valued messages.

We conclude, then, that Article 10's grandfather provision is invalid because it imposes an impermissible penalty on fully protected speech, and Somerville has failed to offer a rational basis for imposing this burden on the exercise of First Amendment rights. Our conclusion does not necessarily mean that Somerville is prohibited from achieving its dual objectives of eliminating most billboards while giving substantial protection to onsite signs. Ackerley has offered one possible approach: exempting from the ordinance all nonconforming signs except those over 65 square feet on the ground that the larger a sign, the greater the aesthetic harm. Such an approach would be based on content-neutral criteria related to the city's aesthetic goals, be justified by content-neutral reasons, and apply equally to all speakers.[15]

Several other alternatives for accomplishing Somerville's objective of limiting the total number of exempted nonconforming signs, without relying on the shaky foundation of past speech, come quickly to mind: exempting only signs in less congested parts of the city, or only signs that meet the ordinance's prospective height requirements, or only those not on rooftops. All of these methods would bear some relationship to the aesthetic goal that underlies the statute.[16]

**15.** Such an ordinance would fall directly within the time, place, or manner category of speech regulations, and would need to meet the three-part test established for content-neutral regulations. *See Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981).

**16.** None of the cases relied on by the district court, in which billboard ordinances were upheld, is directly on point here. For example, in *Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 833 F.2d 43 (4th Cir.1987), the plaintiff argued that the ordinance was invalid only because it banned *commercial* offsite advertising. In three other cases, courts upheld ordinances that allowed only onsite signs in certain areas, but none of these cases involved a mechanism for discriminating among speakers by irrationally relying on past speech. *See*

## III.

Article 10 contains a severability clause stating that "[t]he invalidity of any section or provision of this Article shall not invalidate any other section or provision hereof." Section 10.10. Accordingly, we sever and hold invalid only that portion of section 10.7 that withholds eligibility for grandfathering from those signs that displayed commercial advertising during the year preceding the effective date of Article 10. *See Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (" '[A] court should refrain from invalidating more of the statute than is necessary....' ") (quoting *Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion)).

In its reduced form, Article 10 allows any existing nonconforming sign to remain if it continuously, from the effective date of the ordinance, displays either offsite noncommercial or onsite commercial or noncommercial messages. Somerville suggests that the ordinance be considered effective as of the date of its enactment on July 28, 1986, rather than from the date of this opinion, meaning that any sign still carrying offsite commercial advertising on that date would have to be taken down.

This position is fundamentally unfair. In July 1986, the ordinance exempted only nonconforming signs that had not carried offsite commercial messages for the entire

*Rzadkowolski v. Village of Lake Orion,* 845 F.2d 653 (6th Cir.1988); *Wheeler v. Commissioner of Highways, Com. of Ky.,* 822 F.2d 586 (6th Cir.1987); *Major Media of the Southeast, Inc. v. City of Raleigh,* 792 F.2d 1269 (4th Cir.1986). Moreover, to the extent any of these cases suggests that a city explicitly may favor commercial onsite messages over noncommercial messages, we disagree.

We note two other recent billboard cases not inconsistent with our views here. In *Naegele Outdoor Advertising, Inc. v. City of Durham,* 844 F.2d 172 (4th Cir.1988), the court upheld an ordinance that banned only offsite *commercial* speech—as did the September 1985 version of Article 10. The Ninth Circuit in *National Advertising Co. v. City of Orange,* 861 F.2d 246 (1988), struck down an ordinance that allowed signs carrying some, but not all, types of noncommercial messages.

preceding year, and virtually all of Ackerley's signs had displayed such messages. Thus, prior to our decision today, Article 10 did not give Ackerley the option of changing the messages on its signs but instead required that the signs be taken down.

Somerville, however, argues that Ackerley should have realized that we might strike only the retrospective aspect of section 10.7, and that Ackerley therefore should have changed its signs on July 28, 1986 in order to comply with the prospective portion of the ordinance. We decline to impose on Ackerley the obligation to have converted its signs in order to comply with half of an obviously complex regulation. We believe Ackerley is now entitled to a reasonable period to change its signs so that they meet the ordinance's prospective requirements.[17]

*Reversed and remanded.*[18]

---

**17.** We leave the setting of a specific time period to the district court. We recognize, of course, that Somerville may choose immediately to enact a new version of Article 10 that meets the criteria set out in this opinion, making any fine-tuning of the present ordinance superfluous.

We note, in addition, that Ackerley apparently has been converting its signs to noncommercial messages as contracts with commercial customers expire.

**18.** In light of our disposition, we need not address Ackerley's takings claim.