USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-2324 ACKERLEY COMMUNICATIONS OF MASSACHUSETTS, INC., Plaintiff, Appellant, v. CITY OF CAMBRIDGE, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Coffin and Bownes, Senior Circuit Judges. _____________________ ____________________ Andrew L. Frey with whom Eric M. Rubin, Walter E. Diercks, ______________ _____________ _________________ Kenneth S. Geller, Charles Rothfeld, George A. Berman, Steven S. _________________ ________________ ________________ _________ Broadley, and Joseph S. Berman were on brief for appellant. ________ ________________ Peter L. Koff with whom Arthur J. Goldberg was on brief for _____________ __________________ appellees. ____________________ July 10, 1996 ____________________ COFFIN, Senior Circuit Judge. We are asked in this appeal ____________________ to sort out the constitutional principles at play when a municipality, in pursuit of improved aesthetics, regulates signs and billboards. In many respects, this is a case of deja vu. Seven years ago, the same plaintiff successfully challenged a similar sign ordinance as violative of the First Amendment. See ___ Ackerley Communications of Massachusetts v. City of Somerville, ________________________________________ ___________________ 878 F.2d 513 (1st Cir. 1989). Although the defending municipality has changed -- Cambridge now replaces its neighbor Somerville -- the central issue remains the same: the validity of distinctions drawn between "onsite" and "offsite" signs and between commercial and noncommercial messages.1 With  ____________________ 1 We repeat our explanation of the onsite/offsite distinction from City of Somerville, 878 F.2d at 513 n.1: __________________ An onsite sign carries a message that bears some relationship to the activities conducted on the premises where the sign is located. For example, an onsite sign may simply identify a business or agency ("Joe's Hardware" or "YMCA"), or it may advertise a product or service available at that location ("Budweiser Beer" at Parise's Cafe or child care at the Lutheran Church). Depending upon the business or agency, the message on the sign may be deemed either commercial or noncommercial. An offsite sign -- the category into which most billboards fit -- carries a message unrelated to its particular location. These signs also may display either commercial or noncommercial messages. For example, an offsite sign may advertise "Great Gifts at Kappy's Liquors," with Kappy's Liquors being located at some distance from the sign, or it may say "No one should be left out in the cold. Write: Citizens Energy Corp."  Thus, the onsite/offsite distinction is not a distinction between signs attached to buildings and free standing signs. An offsite sign may be located on a building rooftop, but because the product, good, or service it advertises is not available at the sign's -2- appreciation for the difficulties faced by municipalities in this complicated area, we nonetheless conclude that the First Amendment bars enforcement of the challenged ordinance in the circumstances present here. I. Factual Background __________________ Plaintiff Ackerley Communications is a Massachusetts billboard company that has operated an outdoor advertising business for more than 100 years. In the City of Cambridge, it maintains 46 signs on 32 separate structures. All of these billboards became nonconforming when Cambridge amended a zoning ordinance in 1991 to tighten the restrictions on the height, size, number and location of signs that may be displayed in the city.2 Ackerley, hoping to find protection in the First Amendment, has displayed only noncommercial messages since the amended ordinance went into effect. The ordinance itself makes no distinctions based on the messages displayed on the signs. Such differential protection is  ____________________ location, it is classified as offsite. For example, if a sign advertising the products available at Joe's Hardware is located atop the Parise Cafe building, Joe's sign is offsite. In this opinion, we use the terms on-premise and off-premise interchangeably with onsite and offsite. 2 Article 7.000 of the Zoning Ordinances of the City of Cambridge provides, inter alia, that four categories of _____ ____ nonconforming signs must be removed within four years from the statute's enactment, or from the first date that the sign became nonconforming. The signs required to be removed are those on rooftops, freestanding signs exceeding 30 square feet, wall signs exceeding 60 square feet and projecting signs exceeding 10 square feet. 7.18.1. All of Ackerley's signs fall into at least one of these categories. -3- conferred instead by a state statute, the Massachusetts Zoning Act, Mass. Gen. L. ch. 40A, 6, which mandates grandfather protection for all nonconforming uses -- including signs -- that are in existence at the time a zoning ordinance is enacted or amended. The statute excludes from such protection, however, billboards, signs and other advertising devices subject to the jurisdiction of the Massachusetts Outdoor Advertising Board (OAB). The OAB regulates so-called "off-premise" signs.3 The combined effect of the local ordinance and state law, therefore, is to protect signs that do not conform to the amended Cambridge ordinance only if they carry onsite messages. None of ____ Ackerley's billboards are grandfathered under this scheme because all of its messages are offsite ones -- i.e., they are unrelated to the property on which they sit. Thus, Ackerley's 46 noncommercial, off-premises messages must be taken down while a large number of nonconforming commercial signs are protected. Cambridge officials recognized the limited nature of the grandfather provision, and, indeed, endorsed its preference for onsite signs, finding: Nonconforming off-premise signs, which traditionally have been used primarily to advertise commercial goods and services not available on the same premises, have a significantly greater adverse aesthetic impact than on premises signs because of their larger sizes, greater  ____________________ 3 Ackerley accurately points out that the descriptive terms "off-premise" and "on-premise" can be misleading when used to modify the word "sign", since the applicable category is determined not by a sign's location, but by its message. As ________ _______ noted supra, at note 1, a sign attached to a building can carry _____ either off-premise or on-premise messages.  -4- heights, less attractive appearances, and/or more intrusive locations. Zoning Ordinance Article 7.000, 7.11.1(F). The Findings section of the ordinance further states that "[t]he public interest is served by use of signs by businesses and services to identify their premises, or the products or services there available, or to display noncommercial messages." Id. at (G). ___ The importance of noncommercial messages is reflected in a "substitution provision" in the ordinance, which provides that "[a]ny sign permitted under this Article may contain, in lieu of or in addition to any other copy, any noncommercial message." Article 7.000, 7.17. Consistent with this scheme, when the ordinance's four-year grace period expired in 1995, Cambridge informed Ackerley that its signs would have to come down. Ackerley sought a preliminary injunction barring enforcement of the ordinance, arguing that it violates the First Amendment because it favors nonconforming signs that carry commercial messages over similar signs that carry noncommercial messages.4 The district court denied injunctive relief. It found that Ackerley had not demonstrated a likelihood of success on the merits because the ordinance "in effect[] distinguishes between on-site and off-site signs, which is permissible, and not between commercial and non-commercial messages."  ____________________ 4 Ackerley also alleged a Fifth Amendment takings claim, which is not before us at this time. -5- Ackerley consequently filed this appeal, arguing that the district court misapplied relevant First Amendment law. It contends that the Supreme Court's decision in Metromedia, Inc. v. ________________ San Diego, 453 U.S. 490 (1981), and our own decision in City of __________ _______ Somerville, 878 F.2d at 513, require a conclusion that the __________ Cambridge ordinance is unconstitutional as applied to Ackerley's signs. Although this case comes to us as an appeal of a denial of preliminary relief, both parties at oral argument urged us to resolve the dispute on its merits because the issue is purely a legal one that needs no further record development. We accept the invitation to make the ultimate determination, and proceed with our analysis from that perspective.  II. Discussion __________ A. Background __________ The City of Cambridge has been working for a number of years to improve its aesthetic environment through the increasingly restrictive regulation of signs. The 1991 revisions to its sign ordinance for the first time required removal of certain non- conforming signs. Although the ordinance affects many more signs than just the large, visually demanding -- some would say offensive -- ones that most of us would identify as billboards, a comprehensive report prepared in connection with the revised ordinance reveals that they are the city's most pressing -6- concern.5 Billboards typically carry offsite messages. The state's grandfathering provision -- exempting nonconforming on- __ premise signs -- therefore nicely dovetails with Cambridge's priority to eliminate billboards as soon as possible.6 Onsite signs, most of which are business signs, may stay; offsite signs -- many of which at the moment in Cambridge are billboards carrying noncommercial messages -- must go.  Ackerley offers two primary reasons why this scheme violates the First Amendment. First, it claims that the Cambridge ordinance directly conflicts with our decision in City of ________  ____________________ 5 The report on the Cambridge sign environment concluded that off-premise signs -- a term it equated with billboards -- were more troubling than onsite signs because, inter alia, they _____ ____ dominate the surrounding environment, both visually and physically, and are not likely to be removed except as the result of a total redevelopment of the site on which they are found.  The report found that on-premise signs, in contrast, have a more "limited and contained" aesthetic impact because "they are placed low on their host buildings, they are obscured from afar by street trees and almost without exception they do not approach the sheer size and dominance of off-premise signs." In addition, the report stated that onsite signs were likely to be less permanent, since businesses are likely to change hands and new signs would not be grandfathered. 6 For purposes of our discussion, we treat the state grandfathering provision as part-and-parcel of the Cambridge ordinance, and certain of our references to "the Cambridge ordinance" will assume that the grandfathering provision is contained within it. Indeed, as noted supra, at pages 4-5, the _____ ordinance seems to incorporate the state grandfather provision as part of its regulatory scheme. We emphasize that the validity of the state statute, as an independent matter, is not a question before us. The issue we must decide is whether Cambridge may enforce its sign ordinance to require Ackerley to remove its billboards. As Cambridge's counsel acknowledged at oral argument, the impact of the state grandfathering provision is relevant to that inquiry regardless of the statute's constitutionality. -7- Somerville, where we found the ordinance to be impermissible __________ based on a grandfathering provision that exempted only signs that had carried no offsite commercial speech during the year preceding the ordinance's enactment. We held that "[i]t is without question that the government may not impose a penalty -- in this case, denying the right to continue speaking by means of nonconforming signs -- because of a person's constitutionally protected past speech." 878 F.2d at 519.  Ackerley contends that Cambridge's ordinance, when applied in light of the state statute, suffers from essentially the same flaw: the right to use nonconforming signs in the future to express noncommercial messages is given by the substitution provision only to certain speakers, based on their past speech -- in this instance, to those who were displaying onsite messages on the day the ordinance was enacted. Ackerley maintains that distributing the future right to speak in a certain way (i.e., through large, nonconforming signs) based on the content of earlier speech is impermissible whether the restriction looks back a year in time, as it did in Somerville, or only a day. This must be so, it asserts, because the practical effect of the two ordinances is identical; both reserve the right to display noncommercial messages primarily to a limited category of speakers, business owners. Ackerley's second theory is that the ordinance is invalid because it imposes an impermissible content-based restriction on speech: whether a sign may remain is determined by the message it -8- carries. Because most content-based restrictions are presumptively invalid, see City of Ladue v. Gilleo, 114 S. Ct. ___ ______________ ______ 2038, 2047 (1994) (O'Connor, J., concurring); National ________ Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir. _________________ _______________ 1995), and subject to strict scrutiny, even Cambridge seems to acknowledge that, if this traditional content-based inquiry applies, its ordinance would fail. See Burson v. Freeman, 504 ___ ______ _______ U.S. 191, 211 (1992) ("[I]t is the rare case in which . . . a law survives strict scrutiny."). Cambridge responds that enforcement of its ordinance is not inconsistent with City of Somerville because the regulation does ___________________ not use "past speech" as the distinguishing criterion. In its view, the grandfather provision permissibly distinguishes between categories of signs (onsite vs. offsite), and such a distinction inevitably must relate to the signs as they existed at a particular point in time. Cambridge further contends that its ordinance is a valid content-neutral regulation that does not require strict scrutiny. Under traditional First Amendment analysis, we probably should address as a threshold matter whether the onsite/offsite grandfathering restriction is a content-based regulation that triggers strict scrutiny.7 See City of Ladue, 114 S. Ct. at ___ ______________  ____________________ 7 In "commonsense" terms, the distinction surely is content- based because determining whether a sign may stay up or must come down requires consideration of the message it carries. The Supreme Court made such an observation in City of Cincinnati v. __________________ Discovery Network, Inc., 113 S. Ct. 1505, 1516-17 (1993), which _______________________ involved a city policy banning newsracks carrying commercial handbills but not those carrying newspapers. The Court noted: -9- 2047 (O'Connor, J., concurring) ("The normal inquiry that our doctrine dictates is, first, to determine whether a regulation is content-based or content-neutral, and then, based on the answer to that question, to apply the proper level of scrutiny."); National Amusements, 43 F.3d at 736. We choose to sidestep that ___________________ difficult question, however, because we conclude that the Cambridge scheme suffers from two readily identifiable First Amendment flaws that bar its enforcement. B. Distinguishing Among Categories of Noncommercial Speech _______________________________________________________  ____________________ Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is "content-based." See also National Amusements, Inc. v. Town of Dedham, 43 F.3d ___ ____ _________________________ ______________ 731, 738 (1st Cir. 1995); Whitton v. City of Gladstone, Mo., 54 _______ ______________________ F.3d 1400, 1403-04 (8th Cir. 1995) ("The Supreme Court has held that a restriction on speech is content-based when the message conveyed determines whether the speech is subject to the restriction.").  (cont'd) (7 cont'd) Cambridge acknowledges that the onsite/offsite distinction indirectly has a content-based effect because most on-premise signs are commercial in nature and most noncommercial messages are off-premise. In Cambridge, the disadvantage to noncommercial speech is magnified because of Ackerley's decision to change all of its billboards to noncommercial messages. Several courts, however, have found the offsite/onsite distinction to be essentially content-neutral, at least for the purpose of determining the correct standard. See, e.g., Rappa v. ___ ____ _____ New Castle County, 18 F.3d 1043, 1067 (3d Cir. 1994); Messer v. _________________ ______ City of Douglasville, Ga., 975 F.2d 1505, 1509 (11th Cir. 1992).  _________________________ In Rappa, a divided court noted that "[f]avoring onsite over off- _____ site speech probably leads to the effect of favoring commercial speech over non-commercial speech as most conspicuous onsite speech is probably commercial, but this effect is too attenuated for us to take into account." 18 F.3d at 1056 n.19. -10- While not facially preferring commercial messages to noncommercial ones -- a preference barred by Metromedia -- the __________ Cambridge scheme does draw a line between two types of noncommercial speech -- onsite and offsite messages.8 This line _____________ has the effect of disadvantaging the category of noncommercial speech that is probably the most highly protected: the expression of ideas. The only signs containing noncommercial messages that are exempted are those relating to the premises on which they stand, which inevitably will mean signs identifying nonprofit institutions. In its report, the city emphasizes the important role that on-premise signs play "in promoting activities important to the well-being of the City." But with rare exceptions, the First Amendment does not permit Cambridge to value certain types of noncommercial speech more highly than others,9 particularly when the speech disfavored includes some -- like political speech -- that is at the core of the First Amendment's value system.10  ____________________ 8 Ackerley does not contest the city's authority to require removal of nonconforming signs that display offsite commercial __________ messages. See Metromedia, Inc. v. San Diego, 453 U.S. 490, 512 ___ ________________ _________ (1981) (a city lawfully may exempt signs bearing onsite commercial messages without also exempting those bearing offsite __________ commercial messages). __________ 9 For example, an ordinance that exempted only highway speed and directional signs, and municipal street signs, probably could survive strict scrutiny. See John Donnelly & Sons v. Campbell, ___ ____________________ ________ 639 F.2d 6, 9 (1st Cir. 1980). 10 An affidavit from Ackerley's public affairs director through mid-1994 states that the material displayed on Ackerley's signs since the 1991 ordinance revisions has included election campaign information for candidates for City Council and County Commissioner, artwork created by Cambridge students, promotion of -11- See Metromedia, 453 U.S. at 514-15 ("Although the city may ___ __________ distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests. . . . With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse . . . ."); see also Rappa v. New Castle County, 18 F.3d 1043, 1063 ___ ____ _____ _________________ (3d Cir. 1994) ("The rule against content discrimination forces the government to limit all speech -- including speech the government does not want to limit -- if it is going to restrict any speech at all. By deterring the government from exempting speech the government prefers, the Supreme Court has helped to ensure that government only limits any speech when it is quite certain that it desires to do so."); National Advertising Co. v. ________________________ City of Orange, 861 F.2d 246, 248-49 (9th Cir. 1988).11 ______________ Cambridge does not suggest that there is an aesthetic _________ difference between a "Remember to Vote" message and one announcing the location of the public library; it simply maintains that the physical characteristics of "Public Library"  ____________________ a Cambridge literacy program, information about a Cambridge voter registration drive, and public service announcements about such topics as food stamps, the campaign against drunk driving, and AIDS prevention. 11 The court in National Advertising invalidated the ____________________ ordinance at issue because of exemptions for specific types of noncommercial speech, while reserving judgment on whether a categorical limitation of noncommercial messages to onsite activities would be constitutional. 861 F.2d at 249 & n.3. -12- signs are more likely to be less objectionable because they tend to be smaller and less obtrusive than most signs carrying offsite messages. The ordinance, however, gives protection based on the message and not the physical characteristics, and it is that distinction that the city must justify.12 Perhaps if a total ban of signs were at issue, signs identifying buildings would be a permissible limited exception because, like traffic and safety signs, they would serve a substantial need that could not be met in any other way. In this case, however, we consider not a total ban, but only restrictions on size, style and location. The identification interest for nonconforming signs cannot satisfy _____________ even intermediate scrutiny when the ordinance presumes that identification can be accomplished adequately in the future by smaller signs. C. The City of Somerville Problem: Penalizing Past Speech ______________________________________________________ The regulation's second flaw arises from the manner in which it seeks to protect ideological speech. The substitution provision guarantees that noncommercial messages may be placed on any exempted sign. What this means, however, is that Cambridge is choosing which speakers may in the future display offsite noncommercial messages on nonconforming signs in the way City of _______ Somerville held was impermissible -- by looking to past speech. __________  ____________________ 12 Indeed, although the city's sign report emphasized that, "almost without exception," on-premise signs have less of a negative visual and aesthetic impact than billboards, the report acknowledged that "[m]any on-premise signs are of course disappointing" and "can at times be too large, too high, too visually loud." -13- Only those speakers whose signs displayed onsite messages on the day of the ordinance's enactment may substitute noncommercial messages for the previous ones. We explored at some length in City of Somerville the dangers of awarding future speech rights ___________________ based on past speech. See 878 F.2d at 519-20. ___ Although those dangers may seem less likely from the Cambridge regulation because it does not, like Somerville's, disqualify speakers based on only a single day's display of a non-preferred message (i.e., offsite commercial) during the course of a year, the Cambridge scheme's reliance on the date of enactment nevertheless eliminates speakers from future access to a particular medium based on their past choice of lawful speech. If it is impermissible to assign future speech rights based on the content of past speech, the amount of past speech does not strike us as significant. The chilling effect that results from linking future speech to past speech exists even if the pressure to conform one's speech is compressed into a short time frame. Moreover, the division drawn here between those who may and may not use nonconforming signs in the future, for the most part, isolates business and property owners as a privileged class. As Cambridge freely acknowledges, onsite signs typically are commercial in nature. Because the substitution provision gives the right to display noncommercial messages on nonconforming signs only to those individuals whose signs previously carried onsite messages, the primary effect of the substitution provision -14- is to give only commercial speakers the option of changing their signs to noncommercial messages. Giving an identifiable group virtually exclusive access to the use of a medium is wholly inconsistent with First Amendment principles; it is doubtful that the noncommercial messages of interest to business owners would reflect as broad a cross- section of viewpoints as might occur in a marketplace in which every speaker has equal footing to speak.13 Indeed, the case law makes it clear that even more problematic than the loss of all noncommercial messages would be the selective preservation of them. See Turner Broadcasting System, Inc. v. FCC, 114 S. Ct. ___ ________________________________ ___ 2445, 2476 (1994) ("Under the First Amendment, it is normally not within the government's power to decide who may speak and who may not, at least on private property or in traditional public fora.");14 Somerville, 878 F.2d at 518 ("Even if a complete ban __________  ____________________ 13 It should be noted that the Cambridge ordinance does not ban all noncommercial speech, except for that allowed on ___ nonconforming signs by the substitution provision. The ordinance also permits noncommercial messages on conforming signs, which __________ are those that do not exceed ten square feet in area. At issue here, however, is the selective grant of the right to speak through the more effective medium of large, nonconforming signs. 14 The Court in Turner Broadcasting further noted that time, ___________________ place and manner restrictions are permissible in large part because they apply to all speakers. 114 S. Ct. at 2476. It continued: Laws that treat all speakers equally are relatively poor tools for controlling public debate, and their very generality creates a substantial political check that prevents them from being unduly burdensome. Laws that single out particular speakers are substantially more dangerous, even when they do not draw explicit content distinctions. -15- on nonconforming signs would be permissible, we must consider carefully the government's decision to pick and choose among the speakers permitted to use such signs.") (citing and quoting First _____ National Bank of Boston v. Bellotti, 435 U.S. 765, 784-85 (1978) ________________________ ________ ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue.")). What made this case particularly difficult is that the "offsite" label, in practical terms, embraces not only most noncommercial signs but also most of the worst aesthetic offenders. In addition, most offsite signs tend to display commercial messages; Ackerley's present configuration in Cambridge is a deliberate departure from its usual mixture of messages (15% noncommercial) in order to place itself in the best possible position to retain use of its sign faces. Limiting grandfather protection to onsite signs thus is an effective means of accomplishing the city's legitimate objective of improving aesthetics, and typically would result in the loss primarily of offsite commercial messages. The fact remains, however, that the grandfathering benefit is conferred in content-based terms that have no aesthetic justification and effectively penalizes a category of speakers based on their prior choice of message. In addition, nearly all of the sign owners privileged to display offsite noncommercial messages on nonconforming signs may be expected to share similar  ____________________ Id. ___ -16- views on certain matters of public interest. We hold that the First Amendment does not allow Cambridge to achieve its aesthetic objective by allocating the right to speak in this way.15 D. Remedial Option _______________ We recognize that our conclusion puts Cambridge in a peculiar position because the content-based grandfathering derives from state law. Relief from this disability condition is beyond the scope of this court's power in this case. Any change in state law probably must be left to the workings of the political process. As we noted in Somerville, it is possible to __________ construct a justifiable, content-neutral grandfather provision that will advance the city's "dual objectives of eliminating most billboards while giving substantial protection to onsite signs," 878 F.2d at 522. A grandfather provision could, for example, exclude from grandfathering all signs over a certain square  ____________________ 15 The substitution provision does not cure the problem because it does not affect eligibility for exemption. As in ___________ Somerville, a speaker's willingness to display noncommercial messages in the future is insufficient to qualify that speaker's signs for exemption; eligibility for future use is based on past ____ speech. Indeed, the substitution provision appears to lead to a potentially bizarre operation of the sign ordinance. It seems that Ackerley could have protected its billboards by changing them to onsite commercial messages before the ordinance went into effect. Although the onsite messages available for some of the signs likely would be limited, creative possibilities -- such as "No Trespassing" or "This Property Not for Sale" -- seem to exist. The substitution provision apparently would have allowed Ackerley to revert to noncommercial messages the next day. Such a scheme strikes us as irrational. In addition, First Amendment values are inverted: Ackerley's signs would be protected if they contained (onsite) commercial messages but not if they contained (offsite) noncommercial ones. -17- footage on the ground that the larger the sign, the greater the aesthetic harm.16 Indeed, Cambridge's own ordinance includes such a provision. III. Conclusion __________ The Cambridge ordinance contains a severability provision stating that, in the event some portion of it is declared invalid, it is the City's intent that the remainder of the ordinance continue in full force and effect. We do not in this decision rule unlawful any particular section of the ordinance. Rather, because the constitutional problem stems from the interplay of the ordinance and the state provision, we hold only that Cambridge may not require removal of signs displaying noncommercial messages based on their exclusion from exemption under the state provision. Reversed and remanded. ______________________  ____________________ 16 "Such an ordinance would fall directly within the time, place, or manner category of speech regulations, and would need to meet the three-part test established for content-neutral regulations. See Heffron v. International Society for Krishna ___ _______ _________________________________ Consciousness, Inc., 452 U.S. 640, 647-48, 101 S. Ct. 2559, 2563- ___________________ 64, 69 L.Ed.2d 298 (1981)." City of Somerville, 878 F.2d at 522 __________________ n.15. -18-