795 A.2d 728

ELLER MEDIA COMPANY

v.

MONTGOMERY COUNTY, Maryland, et al.

Nos. 00571, 00867, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Jan. 30, 2002.

Reconsideration Denied April 17, 2002.

Jeffrey Harris (Jason Sean Garber, Eric M. Rubin, Walter E. Diercks and Rubin, Winston, Diercks, Harris & Cooke, LLP, on the brief), Washington, DC, for appellant.

Karen L. Federman Henry, Principal Counsel for Appeals (Charles W, Thompson, Jr., County Atty. and Clifford L. Royalty, Associate County Atty., on the brief), Rockville, for appellee.

Argued before SALMON, SONNER, and JOHN F. McAULIFFE (Ret., Specially Assigned), JJ.

SALMON, Judge.

A useful synopsis of the early history of the litigation involved in this appeal can be found in *Montgomery County v. Revere*, 341 Md. 366, 369–76, 671 A.2d 1 (1996). The current appeal involves three consolidated cases, one of which was filed in the last year of Richard M. Nixon's presidency.[1] The parties currently involved in these cases are Eller Media Company ("Eller") on one side and the County Executive for Montgomery County, the Montgomery County Council, and Montgomery County, Maryland (collectively, "the County") on the other. The source of controversy is thirty-four billboards (currently owned by Eller), which are affixed to fourteen structures located in the County. The County wants the billboards removed but does not want to pay Eller any monetary compensation for the loss of the signs.

---

1. The first case was commenced in January 1974 when Rollins Outdoor Advertising ("Rollins") filed a complaint against appellees. Rollins was succeeded as the owner of the billboards here at issue by Heritage Creative Outdoor Services, Inc., which was later succeeded by Reagan Outdoor Advertising ("Reagan"). Reagan then sold the signs to Revere National Corporation and Universal Outdoor Holding, Inc. ("Revere"). Eller Media Company subsequently bought the billboards from Revere.

In an effort to have Eller remove the billboards, the County enacted zoning ordinances in 1968, 1986, 1992, and 1997. The last three sign ordinances repealed the sign ordinance that immediately preceded it, leaving only the 1997 ordinance currently in effect.

The 1968 and 1992 sign ordinances allowed lawfully non-conforming signs to stay in place for a period of time (an amortization or grace period) before the signs were required to be removed.[2] The 1986 sign ordinance did not allow for any amortization period.

The 1997 ordinance (Montgomery County Ordinance No. 13–76, now codified as Chapter 59F of the Montgomery County Zoning Code (1997)), does not distinguish between commercial and non-commercial signs. It provides, in part:

Off-site sign.

Except for signs permitted by this ordinance, a sign must not be used to identify a site other than the site where the sign is erected. Signs or structures that were lawful on July 28, 1986 or were lawfully constructed, structurally altered, or relocated after July 28, 1986 may be continued for a period of 5 years from July 13, 1992. At the end of this amortization period, the signs or structures must be removed within 90 days at the owner's expense.

See Montgomery County Zoning Code, Chapter 59, Section F.1–7.1(i).

For example, under the terms of the 1997 ordinance, if a McDonald's restaurant had on its premises a billboard identifying the site as a McDonald's, that sign would be permitted

---

**2.** "An amortization provision essentially provides a grace period in which a zoning regulation will not be enforced, 'during which time a property user either can make a use conform to the [regulation], or if a user cannot or chooses not to conform, during which a user can recover all or part of his investment before the use must be discontinued.' "

*Chesapeake Outdoor Enterprises, Inc. v. Mayor and City Council of Baltimore*, 89 Md.App. 54, 59 n. 4, 597 A.2d 503 (1991) (quoting *Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 900 F.2d 783, 785 (4th Cir.1990)).

as an on-premise sign; if a site had a sign that read "Mc-Donald's one mile," it would not be permitted.

The 1997 sign ordinance also limits the size of all signs in Montgomery County. For example, in a residential zone, a sign may not exceed two square feet (section 59F–8(a)) and must not exceed 200 square feet in rural or agricultural zones (section 59F 4.2(d)). All of Eller's signs exceed 200 square feet.

Signs not visible outside the property where erected, signs used by government agencies or utilities erected by order of a police officer or utility official in the performance of its official duties (*e.g.*, to control traffic, warn of danger, etc.) are exempted. Also exempted are signs required to be displayed by law or regulation.

The 1997 ordinance, like the three ordinances that preceded it, did not provide for any monetary payment to be made by the County to reimburse the owners of the billboards for the fair market value of the signs, even though the Maryland General Assembly, in 1983, passed Senate Bill 712, now codified as article 25, section 122E, which provides:

(a) Definitions.—

(1) In this section the following words have the meanings indicated.

(2)(i) "Fair market value" means a value, determined by a schedule adopted by the Department of Transportation, that includes the value of integral parts of an outdoor advertising sign, less depreciation.

(ii) "Fair market value" does not include a value for loss of revenue.

(3)(i) "Outdoor advertising sign" means an off-premises outdoor sign:

1. Commercially owned and maintained; and

2. Used to advertise goods or services for sale in a location other than that on which the sign is placed.

(ii) "Outdoor advertising sign" includes signs composed of painted bulletin or poster panel, and usually referred to as billboards.

(b) In general.—*A county or municipality shall pay the fair market value of an outdoor advertising sign, removed or required to be removed by the county or municipality, that was lawfully erected and maintained under any State, county, or municipal law or ordinance.*

*See* Md. Ann.Code art. 25, § 122E (1999 Repl.Vol.) (emphasis added).

On December 31, 1998, Revere National Corporation, Inc. (one of Eller's predecessors in interest) filed a second amended complaint in the Circuit Court for Montgomery County, in which it sought

to have the Court declare unlawful and enjoin ... the ... County ..., from enforcing Article 59 F of the Montgomery County Zoning Ordinance (the "Sign Regulations"), which makes nonconforming and requires the removal of certain existing lawfully erected signs used for the dissemination of noncommercial and commercial messages, while permitting the continued existence of a substantially greater number of signs that are used for commercial purposes; Revere also seeks compensatory and punitive damages, attorneys fees pursuant to 42 U.S.C. § 1988 and such other relief as the Court deems just and proper.

Montgomery County filed a motion to dismiss the second amended complaint and a motion for summary judgment. The motions court granted summary judgment in favor of Montgomery County as to all counts in the second amended complaint, except for the counts in which the plaintiff claimed (1) entitlement to the fair market value of the billboards under article 25, section 122E or (2) that the sign ordinance, as written, constituted a "taking," without compensation, as prohibited by both the United States and the Maryland constitutions. After hearing evidence as to the fair market value issue, the trial judge, in an apparent change of position, held

that the County was not required to pay Eller any monetary compensation for the removal of the signs under section 122E.

In the court's opinion, the amortization provisions set forth in the 1997 ordinance adequately compensated Eller. Moreover, the trial court expressed the opinion that the 1997 ordinance did not constitute a "taking" under either the Maryland or federal constitution. Nevertheless, as a precautionary matter, in case an appellate court was to disagree with his opinion regarding section 122E or the "taking" issue, the trial judge concluded that the fair market value of the signs (using the methodology set forth in article 25, section 122E(a)(2)(i)) was $470,000. In arriving at this damage figure, the trial judge did not include the fair market value of Eller's leasehold interest in the real property on which the signs were located. Eller filed this timely appeal and raises seven issues.

## I.

### *ISSUE 1*

Did the trial court err in holding that amortization was a lawful substitute for the monetary payment required by article 25, § 122E?

In an oral opinion, the trial court characterized the issue to be resolved as follows:

[D]oes the concept of amortization contained in the Montgomery County ordinance trump the requirement of 122(E) that a County pay the fair market value, or vice versa, does 122(E) trump the County ordinance and require payment of fair market value, even though there may have been an amortization[?]

The lower court, relying exclusively on an opinion by this Court in *Chesapeake Outdoor Enterprises, Inc. v. Mayor and City Council of Baltimore,* 89 Md.App. 54, 597 A.2d 503 (1991), concluded that section 122E was inapplicable if a county provided for a reasonable amortization period for the removal of the signs. The court concluded that the amortiza-

tion period set forth in the 1997 sign ordinance was reasonable.[3]

### A. *Legislative History of Article 25, Section 122E*

In 1982, the Maryland General Assembly had before it Senate Bill 702, which, insofar as is here relevant, is substantively identical to the statute that later was codified as article 25, section 122E. Senate Bill 702 passed the General Assembly, but Governor Harry Hughes vetoed it. His veto message included the following language:

> This bill prohibits any county or principality from removing or requiring the removal of an "off-premises outdoor advertising sign" unless it pays the "fair market value" of the sign in accordance with a schedule of the State Department of Transportation used in conjunction with its highway beautification program. The effect of the bill would be to eliminate the phasing out or "amortization" of certain signs by a local jurisdiction *without requiring payment as a sign regulation and removal strategy.*

> The amortization approach has been employed "by" local government in Maryland for at least 25 years to promote traffic safety and the economic well being, natural beauty, and esthetic features of the particular jurisdiction within certain constitutional limitations, the Maryland courts have recognized amortization as a valid exercise of the governmental police power which does not amount to an unconstitutional "taking" for which the owner of the sign is entitled to compensation. *Grant v. City of Baltimore,* 212 Md. 301, 129 A.2d 363 (1957); *Donnelly Adv. Corp. v. City of Baltimore,* 279 Md. 660, 370 A.2d 1127 (1977).

* * *

---

**3.** The amortization period referred to by the trial judge is the five-year period, starting on July 13, 1992, set forth in section 59–F–7.1(i). Eller contends that, inasmuch as the sign ordinance did not go into effect until December 1997, the amortization period, even if it were a lawful substitute for monetary compensation, was illusory because the amortization period ended *before* the 1997 ordinance went into effect.

That this bill fundamentally changes that which has traditionally been a matter of local concern in Maryland is highlighted by the requests of the Mayor of the City of Baltimore and the County Executive of Montgomery and Baltimore Counties for a veto of Senate Bill 702. In addition, other local elected officials, the Maryland Association of Counties and the Maryland Municipal League have requested a veto.

\* \* \*

In conclusion, I am vetoing Senate Bill 702, not because I oppose compensation to sign owners, but because it does not provide sufficient local flexibility and because its substantial fiscal impact may well halt sign regulation programs at the local level.

(Emphasis added.)

In 1983, Senate Bill 712 was introduced. Opposition to Senate Bill 712 was voiced in a letter from the Maryland Department of State Planning to the Senate's Constitutional and Public Laws Committee. The letter said:

The Department is opposed to Senate Bill 712 which would require local jurisdictions to pay a certain value to owners of non-conforming outdoor advertising signs when such signs are removed, or are required to be removed, by a county or municipality.

Senate Bill 712 would virtually destroy the existing programs of certain local jurisdictions who have amortization schedules for the removal of such signs. The schedules allow a non-conforming sign to remain for a specific period of time before the owner is required to remove it. This grace period allows the owner a chance to gain a fair return on his investment.

Thus, Senate Bill 712, by requiring the jurisdiction to make payment when the sign is removed, makes these amortization schedules useless.

Another concern of this Department is the potential financial and administrative burden this legislation would place on those jurisdictions who are attempting to regulate signs

through zoning. In 1982, we contacted a sampling of metropolitan counties who indicated to us that several hundred non-conforming billboards would be affected by this kind of legislation and the cost to these jurisdictions for removal of these signs would be considerable.

The Department urges an unfavorable report on Senate Bill 712.

A fiscal note accompanying Senate Bill 712 stated that Baltimore City estimated that passage of the bill would increase City expenditures in the following year in the form of payment to sign owners by $150,000. The City presented a statement opposing Senate Bill 712 to the Senate Constitutional and Public Law Committee. In the statement, a representative of the City complained that the legislation "would require the City to pay fair market value for the removal of billboards, placing an unnecessary burden on taxpayers."

Senate Bill 712 was passed by the General Assembly on April 9, 1983, and signed into law by Governor Hughes. Shortly before the bill became law, the Maryland Attorney General's office, on April 1, 1983, responded to an inquiry from Montgomery County Delegate Jennie Forehand as to what effect Senate Bill 712 would have on "existing depreciation schedules utilized by local jurisdictions in lieu of monetary payment." The Attorney General answered the delegate's question by referring her to Governor Hughes's 1982 veto message concerning Senate Bill 702 and opined (impliedly) that enactment of the legislation would eliminate the practice of local jurisdictions of allowing for an amortization (or grace) period for the removal of signs in lieu of paying the owners the fair market value of their signs.

From the above, it is clear that many involved in the legislative process of enacting Senate Bill 712, which was codified as article 25, section 122E, believed that amortization was not a lawful substitute for the monetary payment called for in the statute. This belief is quite understandable in view of the fact that the statute provides that "fair market value" is

to be calculated by reference to schedules adopted by the Department of Transportation.

## B. *The Case of Chesapeake Advertising, Inc. v. Baltimore*

In *Chesapeake, supra,* the plaintiff owned numerous general outdoor advertising signs in Baltimore City. 89 Md.App. at 59, 597 A.2d 503. These signs were located in "Residence Districts, B–1 Business Districts ... [and] in M–1 Industrial Districts." *Id.* In those districts, general advertising signs were prohibited outright by various sign ordinances. *Id.* Additionally, the plaintiff owned and maintained signs in B–2, B–3, B–4, and B–5 Business Districts and M–2 and M–3 Industrial Districts where outdoor advertising signs were allowed but only if permits were obtained. *Id.*

The Court noted in *Chesapeake when* the various sign ordinances were adopted and *what* amortization periods had been provided:

Prior to the City's initial adoption of a zoning ordinance in 1923, building permits had been required for some time for all construction within Baltimore City. *See* Baltimore, Md., Code, Ordinance 155 (1908). The City's prohibition of general advertising-type signs in residential zoning districts dates at least *as far back as 1925. Id.,* Ordinance 1247 (1925). With respect to such signs in office-residential zoning districts, the prohibition dates back *no later than to 1950,* and with respect to such signs in B–1 and M–1 districts, *to 1971. Id.,* Ordinance 711 (1953); Ordinance 1051 (1971). In 1950, the City adopted an amortization provision directing removal of all nonconforming signs in residential and office-residential zoning districts within five years. *Id.,* Ordinance 1101 (1950). In 1971, this provision was recodified and its *effect extended to B–1 and M–1 zoning districts of Baltimore City. Id.,* Ordinance 1051 (1971). *Thus, facially, even nonconforming general advertising signs have not been permitted in residential zoning districts since 1955, or in office-residential, B–1 or M–1 zoning districts since 1976.*

*Id.,* 89 Md.App. at 58–59, 597 A.2d 503 (footnotes omitted) (emphasis added).

In *Chesapeake,* one of plaintiff's contentions was that the City was compelled under article 25, section 122E, to pay it compensation for the removal of its signs. *Id.* at 64, 597 A.2d 503. The trial court held that section 122E did not apply to the City. We held that section 122E *did* apply to Baltimore City (*id.* at 67, 597 A.2d 503), but that the plaintiff was not prejudiced by the circuit court's error because it had failed to present any evidence that the signs were "lawfully erected and maintained under any state, county, or municipal law or ordinance" as required by section 122E. *Id.* at 67, 597 A.2d 503. Because of the plaintiff's failure "to produce at least some evidence that its signs were nonconforming, that is, that they were lawfully in existence *up until the adoption of the zoning restrictions or amortization ordinances in question,"* we held that summary judgment was properly granted in favor of the City. *Id.* at 75, 597 A.2d 503 (emphasis added).

After announcing this holding, the *Chesapeake* Court went on to say, *in dicta:*

> We also wish to make clear that summary judgment would still have been proper in this case even if [plaintiff] had effectively countered the City's assertion that there was no genuine issue as to whether the signs in the City's amortization areas were nonconforming. The Court of Appeals has twice confirmed the constitutional reasonableness of five-year amortization periods for such signs. *Grant v. City of Baltimore,* 212 Md. 301, 129 A.2d 363 (1957); *Donnelly Advertising Corp. v. Mayor and City Council of Baltimore,* 279 Md. 660, 370 A.2d 1127 (1977). The Fourth Circuit cases previously referred to involve four- and five-and-a-half-year amortization periods for such signs. Here, in contrast, due to the passage of time between the end of the amortization period and the City's enforcement of its Zoning Ordinance, sign owners in Baltimore City had an opportunity to amortize their signs over a period of no less than 19 years (and perhaps as long as 41 years). *See Harris v. City of Baltimore,* 35 Md.App. at 581–82, 371 A.2d

706 (court not restricted in determining constitutional reasonableness of amortization provision to consideration of the
original amortization period or its later extension, due to the
passage of time since the enactment of those provisions).
Nor can [plaintiff] be heard to complain that it has only
owned the signs between two and four years. The City
cannot be bound by a business group's ill-conceived decision
to gamble on nonenforcement of the City's zoning laws. *See
Joy v. Anne Arundel County,* 52 Md.App. at 653, 451 A.2d
1237 (delay in enforcing permit provisions is not generally a
defense in a zoning enforcement case); *Nat'l Inst. of Health
Fed. Credit Union v. Hawk,* 47 Md.App. 189, 201, 422 A.2d
55 (1981 [1980]) ("estoppel cannot successfully be invoked
against municipal authorities based on zoning actions").
*Id.*

In the case at hand, both the trial court and the County
interpreted the just-quoted *dicta* to mean that, if a county
zoning ordinance provides for a reasonable period of amortization, then it need not pay the sign owners the fair market
value of the signs as required by section 122E.[4] This is a
misinterpretation of the *Chesapeake dicta.*

In *Chesapeake,* Baltimore City made no attempt to enforce
its sign ordinance against the plaintiff until 1989. *Id.* at 59,
597 A.2d 503. The *Chesapeake dicta* included the assumption
that all of the signs were "lawfully in existence up until the
adoption of the zoning restrictions" (therefore, a non-conforming use), but the last of the zoning restrictions at issue in
*Chesapeake* was adopted in 1976, and the last of the amortiza

---

**4.** Even if a reasonable amortization period were a valid substitute for
payment of the sign's fair market value, the County would not have
been entitled to summary judgment on the ground relied upon by the
motions judge. The 1997 ordinance had a negative amortization period
inasmuch as the grace (or amortization) period ended *before* the effective date of the 1997 ordinance. The 1997 ordinance counted as its
amortization period the five-year period included in the 1992 ordinance. If, as Eller contended, the 1992 ordinance was unconstitutional,
the five-year amortization period (1992–1997) should not have been
considered. Yet, the motions court ruled that the issue of whether the
1992 ordinance was constitutional was moot.

tion periods expired in 1981, some two years before article 25, section 122E, was enacted. Thus, although the *Chesapeake* Court did not explicitly say so, section 122E was inapplicable because none of the signs were being lawfully maintained when section 122E came into effect and, under section 122E, there is no requirement for the payment of fair market value unless the signs were being "lawfully ... maintained." *See* Md. Ann.Code art. 25, § 122E(b).

After *Chesapeake* was decided, the Court of Appeals said in *Revere* that it appeared that article 25, section 122E, required the County to make monetary payment to the sign owners. Thus, the Revere Court did not accept the legal theory that providing for amortization would be a legitimate substitute for payment of fair value as required under section 122E. 341 Md. at 391–92, 671 A.2d 1.

The *Revere* case concerned a 1990 settlement agreement between Montgomery County and one of Eller's predecessors, Reagan Outdoor Advertising, Inc. ("Reagan"). *Id.* at 372, 671 A.2d 1. The agreement involved all of the billboards here at issue. The agreement was incorporated into an April 11, 1990, order of court. The agreement allowed Reagan

to continue "maintain[ing] within the County ... forty-seven [billboards]" for a period of ten years. Reagan could replace and relocate billboards to a new location if either "(i) a lease for the premises on which a sign is located is not to be continued, or (ii) an outdoor advertising structure has been destroyed or has deteriorated to the point that it is no longer in a safe condition." Relocation of billboards was limited to not "more than five signs within any calendar year," with Reagan having the sole discretion as to which signs were to be relocated. The agreement placed certain restrictions on where billboards could be relocated but stated that "in no event shall the County utilize procedures or fees to impair Reagan from exercising its rights under this Agreement."

*Id.* at 372–73, 671 A.2d 1.

In March 1992, the County denied Revere National Corporation ("Revere"), one of the successors in interest to Reagan,

permission to construct a replacement sign pursuant to the settlement agreement. *Id.* at 373, 671 A.2d 1. The County justified its denial upon the legal theory that the agreement with Reagan was void *ab initio* and therefore Revere was impermissibly attempting to build a prohibited sign. *Id.* What happened next was recounted in *Revere:*

Upon the County's denial of its request, Revere filed in the Circuit Court for Montgomery County a "Motion to Adjudicate Defendants In Contempt of Court and For An Order to Enforce Stipulated Consent Agreement." After setting forth the pertinent facts, Revere's Motion asserted that the defendants "have violated the April 11, 1990 Order of this Court." Revere sought to have the defendants adjudicated in contempt, sought an order requiring the defendants to comply with the settlement agreement "which was entered as an order of the [circuit] Court," and requested compensatory damages.

In response, the County filed a "Motion To Vacate The Stipulated Consent Agreement of April 11, 1990," as embodied in the court's order. The County asserted that the settlement agreement is "void *ab initio* because it purports to permit what the Montgomery County Zoning Ordinance prohibits, namely the existence of 47 billboards in Montgomery County." The County went on to state that it "has no authority to make such an agreement or to consent to a court order which violates the Zoning Ordinance's prohibition on billboards...." The County requested the court to find that the settlement agreement "is void *ab initio* and order that it be vacated." The County filed a separate answer to Revere's motion, also asserting, *inter alia,* that the settlement agreement was void.

*Id.* at 373–74, 671 A.2d 1.

The circuit court held that the settlement agreement should be vacated because the County had no power to enter into an agreement that was contrary to its zoning regulations. *Id.* at 375, 671 A.2d 1. The County cited several cases from other jurisdictions, which recognize "that the fundamental public

policy of a State may sometimes require that a final consent judgment be vacated or not given preclusive effect." [5]

The Court of Appeals, after analyzing several cases from sister jurisdictions (*id.* at 380–83, 671 A.2d 1), said:

> We shall assume, *arguendo,* that it would have been proper to vacate the settlement agreement and judgment of April 11, 1990, if the agreement were clearly *ultra vires* as contended by Montgomery County. Nevertheless, for the reasons set forth in Part IV below, we do not agree that the substance of the agreement was clearly *ultra vires.*

*Id.* at 383, 671 A.2d 1.

In *Revere,* the County maintained that (1) implementation of the settlement agreement would clearly be a violation of law because the local zoning regulation prohibits all billboards and (2) "public contract[s] must comply with [the] law or be declared null and void." *Id.* at 390, 671 A.2d 1. The *Revere* Court responded to the County's argument by pointing out that,

---

5. The lead case in this area is *Kelley v. Town of Milan,* 127 U.S. 139, 8 S.Ct. 1101, 32 L.Ed. 77 (1888), which was summarized in *Revere* as follows:

> The Supreme Court explained (127 U.S. at 159, 8 S.Ct. 1101):
>
> "The declaration of the validity of the bonds, contained in the decree, was made solely in pursuance of the consent to that effect contained in the agreement signed by the [parties]. The act of the Mayor in signing that agreement could give no validity to the bonds, if they had none at the time the agreement was made. The want of authority to issue them extended to a want of authority to declare them valid. The Mayor had no such authority. The decree of the court was based solely upon the declaration of the Mayor, in the agreement, that the bonds were valid....
>
> "The adjudication in the decree cannot, under the circumstances, be set up as a judicial determination of the validity of the bonds.... This was not the case of a submission to the court of a question for its decision on the merits, but it was a consent in advance to a particular decision ... [which] gave life to invalid bonds...."
>
> Consequently, under the *Kelley* principle, the act of placing a settlement agreement made by a local government in the form of a court judgment, in an effort to give it the force and effect of a final judgment, will not cure the lack of fundamental power in the governmental entity to make the agreement.

341 Md. at 380–81, 671 A.2d 1.

[i]n determining whether implementation of the settlement agreement would involve activity in violation of law, however, it is necessary to examine all of the applicable law and not simply the district council's zoning regulations. Although a particular activity might be prohibited under local zoning regulations viewed in isolation, when all of the applicable law is considered, including prevailing state or federal law, the local zoning prohibition may be invalid or superseded.

*Id.*

The *Revere* Court went on to say:

When all of the applicable law is considered, it is not at all clear that Revere's contractual right under the settlement agreement to maintain its 47 billboards for ten years was in violation of law. Rather, *it is Montgomery County's position in this case which appears to be in violation of law.* In arriving at this conclusion, we need not reach the federal and state constitutional provisions invoked by Revere. Montgomery County's argument entirely overlooks Code (1957, 1994 Repl.Vol.), Art. 25, § 122E(b), enacted by the Maryland General Assembly in 1983. This statute unequivocally mandates that "[a] county or municipality shall pay the fair market value of an outdoor advertising sign, removed or required to be removed by the county or municipality...."

\* \* \*

*Neither the district council's 1986 regulations prohibiting all billboards, nor any other enactments by Montgomery County which have been called to our attention, provide for compensation to the owner of pre-existing lawfully erected billboards. Insofar as the record in this case discloses, Montgomery County has never offered compensation to Revere or its predecessors.* Instead, prior to the April 1990 settlement agreement, Montgomery County resisted the demands by Revere's predecessors for compensation.

The district council's regulations purporting to ban billboards must be considered in conjunction with Art. 25,

§ 122E. As pointed out by this Court in *Hanna v. Bd. of Ed. of Wicomico Co., supra,* 200 Md. [49] at 57, 87 A.2d [846] at 850, a case relied upon by Montgomery County, "no [government agency] ... has the right to ignore or circumvent the mandate of the Legislature." *Under § 122E, Montgomery County has no authority to ban pre-existing lawfully erected billboards without paying the fair market value of the billboards.* In light of § 122E and the facts disclosed by the record in this case, the trial court erred in holding that Revere's right under the settlement agreement to maintain 47 billboards for ten years was clearly contrary to law. Considering all of the applicable law and the circumstances, the agreement allowing Revere to maintain its 47 pre-existing billboards for ten years appeared to be a reasonable, lawful compromise and resolution of the dispute.[6]

*Id.* at 391–92, 671 A.2d 1 (emphasis added).

██ In the face of the legislative history surrounding article 25, section 122E, the language of the statute, and the straightforward statement by the *Revere* Court that Montgomery County "has no authority to ban pre-existing lawfully erected billboards without paying the fair market value of the billboards," we hold that the trial court erred when it held that the amortization provisions of the 1997 ordinance "trumped" the provisions of article 25, section 122E. Fair compensation, as defined in article 25, section 122E(a), must be paid even if a reasonable amortization period was provided for in the ordinance.[7]

6. It is to be noted that in 1998, after the validity of most of the settlement agreement was confirmed, Eller, because of certain actions of the County and pursuant to rights granted it in the agreement, voided the settlement agreement.

7. Eller contends that the 1997 sign ordinance violates the "taking" clause of the Fifth Amendment to the United States Constitution and Article III, section 40, of the Maryland constitution because under the 1997 ordinance Eller's property can be taken without just compensation being paid. In view of our holding that the ordinance violates the requirements of article 25, section 122E, we need not decide either the

The County argues, in the alternative, that, even assuming that a county cannot evade the requirements imposed by section 122E to pay "the fair market value" of lawfully erected and maintained billboards, that section was here inapplicable because Eller's billboards have not been lawfully maintained since "the early 1970's." While it is true that under the 1968 sign ordinance, the amortization period ended, at the latest, in 1972,[8] there are at least two fatal flaws in the County's alternative argument.

First of all, in the second amended complaint, Eller's predecessor asked that the 1968, 1986, and 1992 sign ordinances be declared unconstitutional. But the County, in its motion for summary judgment, took the position that all counts alleging the unconstitutionality of the earlier ordinances were moot because the ordinances had been repealed. The motions judge adopted the County's mootness argument and dismissed those counts. The County cannot claim on the one hand that it does not matter whether the earlier sign ordinances were constitutional and then assert that the same ordinances legitimately prohibited Eller from maintaining the signs after the amortization period in the 1968 ordinances expired. Additionally, the County fails to explain why, under the holding in *Revere*, signs in existence while the settlement agreement was in effect (1990–1998) were not being lawfully maintained.

Second, in granting summary judgment, the trial judge said that he assumed that the billboards were being lawfully maintained when the 1997 ordinance was enacted. Unless exceptional circumstances exist, an appellate court cannot

federal or state constitutional issue. *See The Baltimore Sun Company v. Mayor and City Council of Baltimore*, 359 Md. 653, 659, 755 A.2d 1130 (2000) (This Court adheres to "the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground.") (quoting *Telnikoff v. Matusevitch*, 347 Md. 561, 579 n. 15, 702 A.2d 230 (1997)).

8. The 1968 sign ordinance required that billboards that failed to conform with the new restrictions were to be removed within two years from the enactment or four years from the date of erection, whichever was later.

affirm the grant of summary judgment on a ground not relied upon by the motions court. *See Bishop v. State Farm Mut. Auto Ins.,* 360 Md. 225, 234, 757 A.2d 783 (2000), and cases cited therein. No exceptional circumstances here exist.

## II.

### *ISSUE 2*

Did the trial court err when it held that section 8–737 of the Maryland Transportation article does not prohibit Montgomery County from requiring Eller to remove its billboards adjacent to federal-aid primary highways without just compensation?

Section 8–737 of the Transportation article of the Maryland Code (2001 Repl.Vol.) reads:

**Compensation for removal of sign adjacent to federal-aid highway.**

(a) *Removal of signs prohibited without just compensation.—A county or municipality may not remove an outdoor sign which is adjacent to a federal-aid primary highway and which was lawfully erected and maintained under State law and in existence or in litigation on or after November 6, 1978 unless just compensation is paid by the Administration.*

(b) *Expenditures contingent upon matching federal funds.*—The Administration is not required to spend any funds under this section until appropriate matching federal funds are available to the State.

(c) *Applicability of subsection (a).*—The provisions of subsection (a) of this section shall not apply to any outdoor sign which is not eligible for matching federal funds.

(Emphasis added.)

According to the second amended complaint, some—but not all—of the signs here at issue were "contiguous to" Federal-Aid Primary Highways. Eller argues:

The trial court erred when it held that Maryland Transportation article Ann. section 8–737 does not prohibit Montgom-

ery County from requiring Eller to remove its billboards adjacent to federal-aid primary highways without just compensation being paid.

■ As a practical matter, the answer to this question makes no difference. If we were to assume, *arguendo,* that section 8–737 *does* prohibit Montgomery County from requiring the removal of Eller's signs without just compensation being paid, Eller's position would not improve in any respect. This last statement is true because article 25, section 122E, prohibits the County from requiring the removal of *any* of the billboards here at issue without payment of the fair market value of the signs. Payment of "the fair market value" of the billboards as required by article 25, section 122E, would also amount to payment of "just compensation." Neither of the parties to this appeal contend otherwise. We will not answer questions whose resolution would not serve a useful purpose. *Hamilton v. McAuliffe,* 277 Md. 336, 340, 353 A.2d 634 (1976) ("That the declaratory judgment process should not be used where a declaration would not serve a useful purpose or terminate a controversy is . . . well settled."). Question 2 is therefore moot.

## III.

### *ISSUE 3*

Did the trial court err when, in calculating the fair market value of the billboards, it failed to take into consideration the value of Eller's leasehold interest in the sites where the billboards are located?

The County takes the position that, if Eller is entitled to the fair market value of the billboards, then the trial judge correctly calculated that value at $470,000. Eller does not take issue with the trial judge's conclusion that the fair market value of the billboards themselves was $470,000. It contends, however, that the lower court erred in failing to award damages for the fair market value of its leasehold interest in the sites where the billboards are located. Therefore, according to Eller, we should remand this case with

instructions to the trial court to calculate the fair market value of the leasehold interest and add that amount to the $470,000 figure.

Section 122E(a)(2) defines fair market value as "a value, determined by a schedule adopted by the Department of Transportation ("DOT") that includes the value of the integral parts of an outdoor advertising sign, less depreciation." The schedule referred to in section 122E(a)(2) is titled "Reproduction Cost Index for Outdoor Advertising Signs." At trial, the index was admitted into evidence as Exhibit 3.

The introduction to the index includes the following language:

Depreciation is to be applied taking into consideration the age, economic factors and conditions of the specific sign.

*The site value may be determined based on the remaining economic life of the sign and applying the present worth of one period based on yield rates for the remaining life of the sign.* In other cases, where the sign is being acquired from commercial or industrial zoned land, the value of the site will be paid for in the acquisition of the land.

(Emphasis added.)

In the body of the index, at Page 31 of Exhibit 3, under a section entitled "Site Valuation," the following language is used:

*The value of the site is to be accounted for in the appraisal of the land* except when doing the valuation for the Highway Beautification Program. Under this program, some signs are considered legal non-conforming use signs and the lease value of the remaining economic life of these signs will determine the site value.

(Emphasis added.)

Eller contends:

[S]ince the valuation in the instant case was being done under Section 122E and not the Highway Beautification Act, Eller was entitled to be compensated for the fair market

value of its leasehold interests for the real property on which it[s] signs are located.

The trial court rejected Eller's argument, stating:

[T]he plaintiff argues that if you look at page 31 of the schedule, it says that the value of the site should be included in the valuation, and I think they are wrong. I do not think that is what it says. I think it says just the opposite.

The trial court provided no hint as to why it thought Eller was wrong, but the County (somehow) manages to uncover the court's actual reasons, *viz:*

The [c]ircuit [c]ourt viewed the absence of a statutory reference to the leasehold and the lack of a precise reference in the schedule to mean that the value of the site is not part of fair market value under the statute. This makes sense when one considers that many of the leases continue on a monthly basis and terminate upon removal of the billboards. Also, the termination of the lease eliminates an expense of the billboard business, and should not constitute an asset or integral part of the structure.

(References to record extract omitted.)

There was no need for the index to make any specific "statutory reference" to leasehold interests. In order for one to have a valuable interest in land, it is not essential to possess fee simple title. A lessee of land, such as Eller, has an interest in the land it leases. This being so, when the index says, with an exception not here relevant, that "the value of the site [i.e., leased premises where the billboard is located] is to be accounted for in the appraisal of the land," payment for the value of the leasehold must be paid.

The County's argument that the leasehold interest does not constitute an asset because the termination of a lease eliminates an expense is without merit. The argument is based on the false premise that the rent to be paid always equals the value of the lease, which, of course, is not necessarily true.

We hold that the trial court erred when it concluded that under section 122E Eller was not entitled to payment of

the fair market value of its leasehold interest in the sites where the billboards are located.

## IV.

### *ISSUE 4*

Did the motions court err when it held that Eller's challenge to Montgomery County's 1968, 1986, and 1992 sign ordinance was moot, despite the fact that Eller sought damages for injuries suffered as a result of the enactment of those ordinances?

In Counts I, II, III, and IV of the second amended complaint, Eller's predecessor challenged the constitutionality of the 1968 sign ordinance; in Counts IX and X, the constitutionality of the 1986 sign ordinance was challenged; and in Counts XV and XVI, plaintiff alleged that the 1992 sign ordinance was unconstitutional. The motions judge granted summary judgment as to those counts on the ground that the constitutional issue was moot.[9] We disagree with that ruling.

First, as already mentioned in our discussion relating to Issue 1, if the 1968 sign ordinance is unconstitutional, then there is no merit, whatsoever, in the County's argument that article 25, section 122E, is inapplicable because the signs have been unlawfully maintained on the premises since 1972. If the 1968 ordinance was unconstitutional, then the signs were lawfully erected and maintained in 1983 when section 122E was enacted. On the other hand, if the 1968, 1986, and 1992 sign ordinances were all constitutional, then the County could successfully argue that the billboards have not been lawfully maintained since (at the latest) 1972 (the end of the amortization period allowed in the 1968 ordinance).

---

9. "A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide."
*Hill v. Scartascini,* 134 Md.App. 1, 4, 758 A.2d 1087 (2000) (quoting *Attorney General v. Anne Arundel County School Bus,* 286 Md. 324, 327, 407 A.2d 749 (1979)).

Second, as previously noted, the second amended complaint alleged that plaintiff suffered damages as a result of the enactment of the sign ordinances of 1968, 1986, and 1992. Eller asserts that the ordinances, even though unconstitutional, prevented it from erecting new signs or replacing old ones. The County, in requesting summary judgment, did not controvert the fact that plaintiff, in fact, had been damaged.

"Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable." 13A, Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* 3533.3 at 262 (2nd ed.1984). *See also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 478 n. 1, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (A plaintiff's suit challenging a repealed minority set aside ordinance was not moot because the plaintiff sought damages for injuries allegedly suffered as a result of the repealed ordinance.); *Jackson Court Condominiums v. City of New Orleans*, 665 F.Supp. 1235, 1240 (E.D.La.1987), *aff'd*, 874 F.2d 1070 (5th Cir.1989) (plaintiff, who sought monetary damages for deprivation of its rights caused by the enactment of a city ordinance, presented a present controversy that the court could grant relief, even though the ordinance in question had been repealed, because the plaintiff sought monetary damages).

The County relies on the cases of *Lake Falls Association v. Board of Zoning Appeals of Baltimore County*, 209 Md. 561, 121 A.2d 809 (1956), and *Gresser v. Anne Arundel County*, 349 Md. 542, 545, 709 A.2d 740 (1998), for the proposition that "no challenge can be pursued against a repealed statute." Neither of these cases contain such a broad holding and, in any event, neither are apposite. The plaintiff in those cases did not allege that damages were caused by the enactment of the challenged statutes.

We hold that the motions judge erred when he declined to decide the issue of whether the 1968, 1986, and 1992 sign ordinances were constitutional.

## V.

### *ISSUE 5*

Did the trial court err when it ruled, without an evidentiary hearing, that the 1997 sign ordinance was a permissible restriction on speech under the test set forth in *Central Hudson Gas and Electric Corporation v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), without ever considering whether the ordinance in fact directly advanced the stated governmental objective to a material degree and whether it reached no further than needed to accomplish the stated ·governmental objective?

Count XXI of the second amended complaint alleges that restrictions on commercial speech embodied in the 1997 ordinance were unconstitutional because the restrictions failed to advance to a material degree the stated governmental purpose in imposing the restriction and reached further than needed to accomplish that purpose.

In the *Central Hudson* case, the Supreme Court utilized a four-part test to determine whether commercial speech was entitled to protection under the first amendment, *viz:* (1) whether the speech is misleading; (2) whether the restriction seeks to implement a substantial governmental interest; (3) whether the restriction directly advances a substantial governmental interest to a material degree; and (4) whether the restriction reaches only so far as needed to accomplish the governmental objective. 447 U.S. at 563–66, 100 S.Ct. 2343. In Supreme Court cases decided subsequent to *Central Hudson,* Prongs 3 and 4 have been considered together and labeled as the "reasonable fit" test. *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 414, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); *Edenfield v. Fane,* 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

■ If commercial speech is misleading, it does not enjoy any first amendment protection. Here, there is no contention

that the signs are misleading. And, Eller admits that the County satisfied the second prong. Eller's main contention in Count XXI is that the sign ordinance was unconstitutional because Prongs 3 and 4 of the *Central Hudson* test had not been met inasmuch as there was no "reasonable fit" between the legislative ends and the means chosen to accomplish those ends.

In the case at bar, the County has the burden of proving that there exists such a "reasonable fit." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Fox*, 492 U.S. at 480, 109 S.Ct. 3028. The issue for decision is whether the County met that burden in its summary judgment submissions.

The 1997 sign ordinance announced its intent, *viz:*

(a) encourage the effective use of signs;

(b) maintain and enhance the aesthetic environment of the County while avoiding visual clutter;

(c) promote the use of signs to identify buildings and geographic areas;

(d) improve pedestrian and vehicle traffic safety; and

(e) promote the compatibility of signs with the surrounding land uses.

Eller contended that it was entitled to an evidentiary hearing as to whether the sign ordinance, on its face, or as applied, met Prongs 3 and 4 of the *Central Hudson* test.[10] In concluding that no evidentiary hearing was required as to Count XXI, the trial judge cited no case that discussed Prongs 3 and 4.

---

10. In its brief, appellant says:

Eller recognizes that it cannot now ask this Court to declare the 1997[o]rdinance unconstitutional. Eller does assert that it is entitled to a remand so that the factual record can be developed which Eller believes will demonstrate that the restrictions on its 34 signs in the County compared with the countless thousands of permitted signs advance the County's stated objectives only to a "minute" or "paltry" degree which will require the Trial Courts to conclude that there is not a "reasonable fit" between the County's stated government interests and the restrictions on commercial speech in its 1997 Ordinance.

Instead, the court relied primarily on *Major Media of Southeast Inc. v. City of Raleigh,* 792 F.2d 1269 (4th Cir.1986), which dealt with a sign ordinance "restricting the size of off-premise signs to 150 square feet facing four-lane streets, or 75 square feet facing two-lane streets, and confining their location to industrial zones...." *Id.* at 1270. Non-commercial signs were exempted. *Id.* In *Major Media,* the trial court granted summary judgment in favor of the City of Raleigh, and the Fourth Circuit Court of Appeals affirmed. *Id.* at 1272–73. The Fourth Circuit rejected, in a summary fashion, Major Media of Southeast's argument that the sign ordinance abridged its customers' first (and fourteenth) amendments rights because it was overbroad. *Id.* at 1270. The court also said:

> The Supreme Court having determined in *Metromedia, supra,* that a city may justifiably prohibit all off-premise signs or billboards for aesthetic and safety reasons, our discussion of [the sign owner's] challenge to the Raleigh ordinance will be brief. The element of the San Diego sign ordinance found offensive to the First Amendment in *Metromedia*—the preference of commercial over non-commercial speech—was removed by the amendment passed by the Raleigh City Council on December 4, 1984. Whatever the effect of the ordinance before amendment, the ordinance now in effect does not run afoul of the First Amendment since it does not treat commercial speech more favorably. Because Raleigh's justifications for its ordinance are virtually the same as those enunciated by San Diego in *Metromedia, supra,* 453 U.S. at 509–510, 101 S.Ct. 2882, we also find, as in *Metromedia,* that the ordinance does not impermissibly burden commercial speech.

*Id.* at 1272.

Here, there was no allegation that the ordinance is overbroad. For that reason and because the *City of Raleigh* case did not deal with whether Prongs 3 or 4 had been met, the case is of limited value for our purposes.

The leading case in the field of governmental restrictions on billboards is *Metromedia v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), where the Court considered a San Diego sign ordinance and discussed, in detail, *Central Hudson's* Prongs 3 and 4. The sign ordinance at issue in the *Metromedia* case provided, in pertinent part:

B. Off–Premise Outdoor Advertising Display Signs Prohibited [11]

Only those outdoor advertising display signs, hereinafter referred to as signs in this Division, which are either signs designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed shall be permitted. The following signs *shall be prohibited:*

1. Any sign identifying a use, facility or service which is not located on the premises.

2. Any sign identifying a product which is not produced, sold or manufactured on the premises.

3. Any sign which advertises or otherwise directs attention to a product, service or activity, event, person, institution or business which may or may not be identified by a brand

---

11. Outdoor advertising traditionally has been classified into two categories: "on-premises" and "off-premises." One commentator describes:

"The on-premise classification of outdoor advertising is referred to as the sign industry, in that signs are custom-made and are manufactured by a sign contractor on premises *not* owned, leased or controlled by the sign contractor or his agent. Such signs are used primarily for the purpose of identifying a business, its products or its services at the point of manufacture, distribution or sale, hence on-premise.

"Off-premise advertising is an advertising service for others which erects and maintains outdoor advertising displays on premises owned, leased or controlled by the producer of the advertising service." Tocker, *Standardized Outdoor Advertising: History, Economics and Self-Regulation, in Outdoor Advertising: History and Regulation* 11, 15, 18 (J. Houck ed.1969).

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 526 n. 5, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring in part).

name and which occurs or is generally conducted, sold, manufactured, produced or offered elsewhere than on the premises where such sign is located.

*Id.* at 494, 101 S.Ct. 2882 (emphasis added).

In *Metromedia*, the plurality opinion was written by Justice White and was joined in by three other justices. Unlike the present case, the litigants in *Metromedia* entered into numerous stipulations of fact. Two stipulations mentioned by the plurality were:

2. If enforced as written, [the ordinance at issue] will eliminate the outdoor advertising business in the City of San Diego.

\* \* \*

28. Outdoor advertising increases the sales of products and produces numerous direct and indirect benefits to the public. Valuable commercial, political and social information is communicated to the public through the use of outdoor advertising. Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive. Joint Stipulation of Facts Nos. 2, 28, App. 41a, 48a.

*Id.* at 544, 101 S.Ct. 2882.

The plurality opinion summarized the effect of the ordinance as follows:

[U]nder the ordinance (1) a sign advertising goods or services available on the property where the sign is located is allowed; (2) a sign on a building or other property advertising goods or services produced or offered elsewhere is barred; (3) noncommercial advertising, unless within one of the specific exceptions, is everywhere prohibited. The occupant of property may advertise his own goods or services; he may not advertise the goods or services of others, nor may he display most noncommercial messages.

*Id.* at 503, 101 S.Ct. 2882.

It is to be noted that the Montgomery County ordinance here at issue does not prohibit nearly as many categories of

billboards as the San Diego ordinance.[12]   At least facially, the prohibition against signs being used "to identity a site other than the site where the sign is erected" will not prohibit off-premises signs that generally advertise products (*e.g.*, "Smoke Camels") or non-commercial signs that advocate good works (*e.g.*, "Save the Whales").

In *Metromedia,* the plurality held that San Diego's ordinance, insofar as it regulated commercial speech, met the four-part test set forth in *Central Hudson.   Id.* at 512, 101 S.Ct. 2882.   A fifth justice (Stevens) joined in that part of the opinion (*id.* at 541, 101 S.Ct. 2882) but dissented from the plurality's holding that the ordinance went too far in prohibiting certain non-commercial speech.[13]

As to Prong 3, Justice White said:

---

**12.**   In its second amended complaint, Eller's predecessor said:

> 30.   The effect of the Sign Regulations, as amended by the 1997 Ordinance, is to prohibit and require the uncompensated removal of all of Revere's billboards, and signs owned by others, which are used to identify a site other than the site where the sign is erected, while permitting other types of signs to continue to disseminate commercial and noncommercial messages.

*Id.* at 512–13, 101 S.Ct. 2882.

**13.**   In holding the ordinance unconstitutional, the plurality said:

> It does not follow, however, that San Diego's general ban on signs carrying noncommercial advertising is also valid under the First and Fourteenth Amendments.   The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others.
>
> As indicated above, our recent commercial speech cases have consistently accorded noncommercial speech a greater degree of protection than commercial speech.   San Diego effectively inverts this judgment, by affording a greater degree of protection to commercial than to noncommercial speech.   There is a broad exception for onsite commercial advertisements, but there is no similar exception for noncommercial speech.   The use of onsite billboards to carry commercial messages related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited.   The city does not explain how or why noncommercial billboards located in places where commercial billboards are permitted would be more threatening to safe driving or would detract more from the beauty of the city.

The more serious question, then, concerns the third of the *Central Hudson* criteria: Does the ordinance "directly advance" governmental interests in traffic safety and in the appearance of the city? It is asserted that the record is inadequate to show any connection between billboards and traffic safety. The California Supreme Court noted the meager record on this point but held "as a matter of law that an ordinance which eliminates billboards designed to be viewed from streets and highways reasonably relates to traffic safety." [*Metromedia v. City of San Diego,*] 26 Cal.3d [848], at 859, 164 Cal.Rptr. 510, 610 P.2d [407], at 412.... *We likewise hesitate to disagree with the accumulated, commonsense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety.* There is nothing here to suggest that these judgments are unreasonable....

\* \* \*

We reach a similar result with respect to the second asserted justification for the ordinance—advancement of the city's esthetic interests. It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an "esthetic harm." ...

It is nevertheless argued that the city denigrates its interest in traffic safety and beauty and defeats its own case *by permitting onsite advertising and other specified signs. Appellants question whether the distinction between onsite and offsite advertising on the same property is justifiable in terms of either esthetics or traffic safety.* The ordinance permits the occupant of property to use billboards located on that property to advertise goods and services offered at that location; identical billboards, equally distracting and even unattractive, that advertise goods or services available

Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.

elsewhere are prohibited even if permitting the latter would not multiply the number of billboards. Despite the apparent incongruity, this argument has been rejected, at least implicitly, in all of the cases sustaining the distinction between offsite and onsite commercial advertising. We agree with those cases and with our own decisions in *Suffolk Outdoor Advertising Co. v. Hulse,* 439 U.S. 808, 99 S.Ct. 66, 58 L.Ed.2d 101 (1978); *Markham Advertising Co. v. Washington,* 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 512 (1969); and *Newman Signs, Inc. v. Hjelle,* 440 U.S. 901, 99 S.Ct. 1205, 59 L.Ed.2d 449 (1979).

In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. *This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising.* Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising. See *Railway Express [Agency Inc. v. People of State of N.Y.],* 336 U.S. [106], at 110[, 69 S.Ct. 463, 93 L.Ed. 533]. Third, San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interest should yield. We do not reject that judgment. As we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere. See *Railway Express, supra,* at 116, 69 S.Ct. 463 (Jackson, J., concurring); *Bradley v. Public Utilities Comm'n,* 289 U.S. 92, 97, 53 S.Ct. 577, 77 L.Ed. 1053. *It does not follow from the fact that the city*

*has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising.* Thus, offsite commercial billboards may be prohibited while onsite commercial billboards are permitted.

*Id.* at 508–12, 101 S.Ct. 2882 (emphasis added)(footnotes omitted).

Prong 4 was quickly disposed of by the *Metromedia* plurality:

[W]e reject appellants' claim that the ordinance is broader than necessary and, therefore, fails the fourth part of the *Central Hudson* test. If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends.

In *Metromedia,* a total of seven justices concluded that San Diego's sign ordinance did not fail directly to advance substantial governmental interest, and that it met all four prongs of the *Central Hudson* test. *Metromedia,* 453 U.S. at 510, 101 S.Ct. 2882 (plurality); *id.* at 549–53, 101 S.Ct. 2882 (Stevens, J., dissenting in part); *id.* at 560–61, 101 S.Ct. 2882 (Burger, C.J., dissenting); *id.* at 570, 101 S.Ct. 2882 (Rehnquist, J., dissenting).

A case closely analogous to *Metromedia* is *Ackerley Communications of the Northwest, Inc. v. Krochalis,* 108 F.3d 1095 (9th Cir.1997). The *Krochalis* court dealt with a City of Seattle ordinance that was substantially similar to the San Diego ordinance analyzed in *Metromedia. Id.* at 1099. In *Krochalis,* both parties offered evidence as to whether "billboards can be traffic hazards, whether they contribute to visual blight, and whether they reduce property value," but the trial judge, relying on *Metromedia,* granted summary judgment and ruled that the ordinance, as a matter of law, passed the *Hudson Central* test. *Id.* at 1097. On appeal, the appellant urged the Court to reverse "because Seattle made

no factual showing that the ordinance advances its goals to a material degree." *Id.* This contention was rejected, in the following language:

> As a matter of law Seattle's ordinance, enacted to further the city's interest in esthetics and safety, is a constitutional restriction on commercial speech without detailed proof that the billboard regulations will in fact advance the city's interests.

*Id.* at 1099–1100.

The County reads *Metromedia* and *Krochalis* to mean that in all cases where billboard ordinances bar some, but not all, commercial speech, then no factual evidence need be presented, and it can be said, as a matter of law, that there is a reasonable fit between the goal sought to be achieved (improve esthetics and traffic safety) and the means used by the municipality. We believe this is far too broad a reading of those cases in light of (1) the scope of the ordinance enacted by Montgomery County when compared to the ordinances at issue in *Metromedia* and *Krochalis* and (2) subsequent Supreme Court decisions.

In *Metromedia,* it was stipulated that the ordinance would, if enforced, eliminate the outdoor advertising business in the City of San Diego. 453 U.S. at 497, 101 S.Ct. 2882 (1981). Although not a complete ban on outdoor advertising, the prohibition of all offsite advertising (with a few exceptions) made a substantial contribution to the City's interest in traffic and esthetics. *Id.* at 510–12, 101 S.Ct. 2882 (plurality opinion). But as mentioned earlier, because Montgomery County's ordinance only bars signs that identify a site other than where the signs are located, much (perhaps most) off-site commercial and non-commercial advertising is allowed. The ordinance appears to allow off-site advertising generally (*e.g.,* "use Burma Shave"), and numerous other types of on-site and off-site non-commercial signs (*e.g.,* "Give to the Salvation Army"). But based on the record before us, we have no idea how many signs will be allowed and how many prohibited—and thus the factual situation here presented is a far cry from that present-

ed in *Metromedia,* where the practical effect of the ordinance would be to "eliminate" the outdoor advertising "industry" in San Diego or in *Krochalis,* which had a statute similar to the one analyzed in *Metromedia.* And, since we know so little about the number of signs affected by the ordinance, it is impossible to say whether the ordinance is so under-inclusive that the restrictions do not advance "a substantial governmental interest" to a "material degree."

In *Bad Frog Brewery v. New York State Liquor Authority,* 134 F.3d 87 (2d Cir.1998), Bad Frog applied to the New York State Liquor Authority for permission to display on its labels a "picture of a frog with the second of four unwebbed fingers extended in a manner evocative of a well known human gesture of insult." *Id.* at 90. The court was called upon to address an attempt by the New York State Liquor Authority to advance the state's interest in preventing exposure of children to vulgar displays by barring such displays from the labels of alcoholic beverages. *Id.* The court said that the Liquor Authority could not validly deny Bad Frog the right to display its label and explained:

We do not mean that a state must attack a problem with a total effort or fail the third criterion of a valid commercial speech limitation. *See [U.S. Federal Communications Com'n v.] Edge Broadcasting,* 509 U.S. [418] at 434[, 113 S.Ct. 2696, 125 L.Ed.2d 345] ("Nor do we require that the Government make progress on every front before it can make progress on any front."). Our point is that a state must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from a beach of vulgarity.

The District Court ruled that the third criterion [of the *Central Hudson* test] was met because the prohibition of Bad Frog's labels indisputably achieved the result of keeping these labels from being seen by children. *That approach takes too narrow a view of the third criterion. Under that approach, any regulation that makes any contribution to achieving a state objective would pass muster.*

*Edenfield* [*v. Fane*], however, requires that the regulation advance the state interest "in a material way." The prohibition of "For Sale" signs in *Linmark* [*Associates, Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977),] succeeded in keeping those signs from public view, but that limited prohibition was held not to advance the asserted interest in reducing public awareness of realty sales. The prohibition of alcoholic strength on labels in *Rubin* [*v. Coors Brewing Co.*, 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532, (1995),] succeeded in keeping that information off of beer labels, but that limited prohibition was held not to advance the asserted interest in preventing strength wars since the information appeared on labels for other alcoholic beverages. The valid state interest here is not insulating children from these labels, or even insulating them from vulgar displays on labels for alcoholic beverages; it is insulating children from displays of vulgarity.

*Id.* at 100 (footnote omitted) (emphasis added).

The issue whether a "reasonable fit" existed (Prongs 3 and 4) was addressed in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In *Discovery Network*, the City of Cincinnati, "[m]otivated by its interest in the safety and attractive appearance of its streets and sidewalks, . . . refused to allow respondents to distribute their commercial publications through freestanding newsracks located on public property." *Id.* at 412, 113 S.Ct. 1505. Cincinnati did permit, however, distribution of non-commercial publications through freestanding newsracks located on public property. The respondents in *Discovery Network* owned 62 of the 1500–2000 newsracks on the public right of way. The Supreme Court said:

The benefit to be derived from the removal of 62 newsracks while about 1500–2000 remains in place was considered "minute" by the District Court and "paltry" by the Court of Appeals. We share their evaluation of the "fit" between the city's goal and its method of achieving it.

*Id.* at 417–18, 113 S.Ct. 1505. The *Discovery Network* Court concluded that,

> [b]ecause the distinction Cincinnati has drawn had absolutely no bearing on the interests it has asserted we have no difficulty in concluding, as did two courts below, that the city has not established the "fit" between its goals and its chosen means that is required by our opinion in [*Bd. of Trustees of State University of New York v.*] *Fox* [, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ].

*Id.* at 428, 113 S.Ct. 1505.

In *Edenfield v. Fane*, 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Supreme Court said:

> It is well established that "the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Fox*, 492 U.S. at 480, 109 S.Ct. 3028. This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction *will in fact alleviate them to a material degree.*

507 U.S. at 770–71, 113 S.Ct. 1792 (emphasis added).

■ In the case *sub judice*, the harm of billboards is undoubtedly real. But, in our view, it cannot be said, as a matter of law, that the County's sign ordinance on its face or as applied will alleviate the billboard problem to a material degree. The issue is fact driven, and Eller is entitled to an evidentiary hearing in this regard. *See Lamar Advertising of Mobile, Inc. v. City of Lakeland*, 980 F.Supp. 1455 (Plaintiff's complaint contained a claim that, *as applied*, the City of Lakeland's sign ordinance violated their first and fourteenth amendment rights and thus an evidentiary hearing was required).

For the foregoing reasons, the grant of summary judgment as to Count XXI shall be reversed.

## VI.

Did the trial court err when it failed to even consider or rule upon Eller's claim [set forth in Count XXII of the amended complaint] that the 1997 sign ordinance violated the First Amendment and the Maryland Declaration of Rights because it conditioned future speech on the control of past speech?

█ In granting summary judgment as to Count XXII, the motions judge did so "for the reasons set forth in the County's motion"; yet the County gave no reasons in its motion why summary judgment should be granted as to that count. Thus, in actuality, the court gave no reasons for its grant of summary judgment. Eller argues that for this reason alone the court's grant of summary judgment as to Count XXII must be reversed.[14] We agree that a reversal is warranted but for somewhat different reasons.

█ Count XXII is founded upon two separate assumptions: (1) sign ordinances that prohibit future speech based upon the content of past permitted and lawful speech are barred by the First Amendment, (2) the 1997 sign ordinance enacted by Montgomery County bars future speech based on past permitted and lawful speech. The first assumption is well-founded. *See, e.g., Ackerley Communications of Mass., Inc. v. City of Cambridge,* 88 F.3d 33 (1st Cir.1996). The second assumption is not.

In *City of Cambridge, supra,* the Town of Cambridge, Massachusetts, enacted an ordinance that required the removal of four categories of non-conforming signs within four years of the statute's enactment or from the date the sign became non-conforming. *Id.* at 34. A state statute, however, required that all existing on-site signs be granted "grandfather

---

14. Unless the trial court had no discretion but to grant summary judgment, an appellate court will not affirm the trial court's grant of summary judgment on any ground other than the one relied upon by the trial court. *Johnson v. MacIntyre,* 356 Md. 471, 480, 740 A.2d 599 (1999).

protection." This meant that off-premises signs alone were required by the ordinance to be removed. *Id.*

Under the Cambridge statute, any sign permitted by the statute on the date of the statute's enactment could be changed to contain any non-commercial message ("the substitution provision"). *Id.* at 38. *Ackerley Communications of Massachusetts* filed suit to enjoin enforcement of the ordinance. It pointed out that off-site signs typically are commercial.

In *City of Cambridge*, the Court said:

The regulation's second flaw arises from the manner in which it seeks to protect ideological speech. The substitution provision guarantees that noncommercial messages may be placed on any exempted sign. What this means, however, is that Cambridge is choosing which speakers may in the future display offsite noncommercial messages on nonconforming signs in the way [*Ackerley Communications of Massachusetts v.*] *City of Somerville* [, 878 F.2d 513 (1st Cir.1989),] held was impermissible—by looking to past speech. Only those speakers whose signs displayed onsite messages on the day of the ordinances's enactment may substitute noncommercial messages for the previous ones. We explored at some length in City of Somerville the dangers of awarding future speech rights based on past speech. *See* 878 F.2d at 519–20.

Although those dangers may seem less likely from the Cambridge regulation because it does not, like Somerville's, disqualify speakers based on only a single day's display of a non-preferred message (*i.e.*, offsite commercial) during the course of a year, the Cambridge scheme's reliance on the date of enactment nevertheless eliminates speakers from future access to a particular medium based on their past choice of lawful speech. If it is impermissible to assign future speech rights based on the content of past speech, the amount of past speech does not strike us as significant. The chilling effect that results from linking future speech to

past speech exists even if the pressure to conform one's speech is compressed into a short time frame.

Moreover, the division drawn here between those who may and may not use nonconforming signs in the future, for the most part, isolates business and property owners as a privileged class. As Cambridge freely acknowledges, onsite signs typically are commercial in nature. Because the substitution provision gives the right to display noncommercial messages on nonconforming signs only to those individuals whose signs previously carried onsite messages, the primary effect of the substitution provision is to give only commercial speakers the option of changing their signs to noncommercial messages.

Montgomery County's ordinance does not contain a "substitution provision." Without such a provision, future speech is not affected by past speech. If someone changes a message on a billboard, whether the billboard stays up or comes down in Montgomery County has nothing to do with what the billboard said in the past. Under the ordinance, the signs that come down are those that either are too big or that identify a site other than the site upon which they are located.

■■■ Although Eller was incorrect when it alleged that the County's sign ordinance conditioned future speech based on past speech, the trial court erred as to Count XXII for an unrelated reason, *viz:* It granted summary judgment as to Count XXII without declaring, in a written opinion, the rights of the parties. What trial judges should do when a plaintiff asks for declaratory relief was recently discussed by Judge Rodowsky, for the Court of Appeals, in *Bushey v. Northern Assurance,* 362 Md. 626, 766 A.2d 598 (2001):

Once again we are presented with an appeal in a declaratory judgment case in which the trial court failed to enter a written declaration of the rights of the parties. Nor did it file any written opinion which could be treated as a declaratory judgment. Instead, the docket entry and the separate document on which the judgment is set forth recite simply that summary judgment was entered in favor of Northern.

> "This Court has reiterated time after time that, when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.' *Christ v. [Maryland] Department [of Natural Resources]*, 335 Md. 427, 435, 644 A.2d 34, 38 (1994)" " '[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of . . . judgment in favor of the prevailing party.' *Ashton v. Brown*, 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited."

*Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 414–15, 687 A.2d 652, 659 (1997).

> The error, however, is not jurisdictional. This Court may, in its discretion, review the merits of the controversy and remand for the entry of an appropriate declaratory judgment by the circuit court. . . .

*Id.* at 651–52, 766 A.2d 598.

Accordingly, on remand the trial court should file a written opinion declaring the rights of the parties. This should be done as to Count XXII and any other count that is not moot where declaratory relief was prayed.

## VII.

Eller's final contention is that the trial court erred when it "ordered Eller to remove all its signs in Montgomery County, despite the fact that the County never requested such relief in any pleading filed in this case."

It is true that the County never requested injunctive relief in any pleading. But Maryland Rule 15–502(b) allowed the Court, "on its own initiative," at any stage in the proceedings, to "grant an injunction upon the terms and conditions justice may require."

This final issue, however, is academic at this stage because, as we have said, the court should not have granted summary judgment as to Count XXI, and accordingly, the question of

whether the 1997 ordinance is unconstitutional (for the reasons advanced by Eller) must still be answered. Thus, the injunction should be dissolved.

### CONCLUSION

Upon remand, an evidentiary hearing should be held to resolve the fact-driven issue raised in Count XXI. If the 1997 sign ordinance is held to be unconstitutional, further proceedings concerning the value of Eller's leasehold interest in the various sites where its signs are located need not be held. If the ordinance is declared not to offend either the Maryland or United States Constitution for the reasons set forth in Count XXI, a trial should be held to determine the fair market value of Eller's leasehold interest in the fourteen sign sites.

On remand, the trial court should consider the constitutionality of the 1968, 1986, and 1992 sign ordinances, and if any of the ordinances are found to violate either the Maryland or United States Constitution (for any of the reasons set forth in the second amended complaint),[15] a determination should be made as to what, if any, damages have been suffered by Eller.

Lastly, as to all counts in the second amended complaint that asks for declaratory relief and are not moot, the court should file a written declaration of the rights of the parties.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEES.**

---

**15.** In *Gresser v. Anne Arundel County,* 349 Md. 542, 552–53, 709 A.2d 740 (1998), the Court provided a useful reminder:

We suggest that when upholding the constitutionality of statutes or ordinances, where there are several constitutional challenges, trial judges should do more than simply declare that the statutes or ordinances are constitutional. That all encompassing pronouncement is generally not helpful or even accurate because the judge is ordinarily considering only the constitutional challenges raised by the parties. What the trial judge in the instant case was probably holding and should have articulated was that the ordinances at issue were not unconstitutional for any of the reasons raised by the parties.